Martin C. LAMBERT, Administrator of the Estate of Travis Martin Lambert; Cynthia Lambert; and Martin C. Lambert, Appellees,

v.

SISTERS OF MERCY HEALTH CORPORATION, a Corporation, Individually and d/b/a Marian Health Center-St. Joseph Unit, Appellant,

and

Leonard H. Boggs and Richard Ratino, Individually and as Boggs and Ratino, a Partnership; and John A. Walck, Defendants.

No. 84–23.

Supreme Court of Iowa.

June 19, 1985.

Walter C. Schroeder, Mason City, for appellant hospital.

N. Richard Willia and Edward J. Keane, Sioux City, for appellees.

Considered by UHLENHOPP, P.J., and HARRIS, McGIVERIN, LARSON and SCHULTZ, JJ.

UHLENHOPP, Presiding Justice.

This appeal in a medical malpractice case presents several issues for consideration: whether plaintiffs Martin C. and Cynthia Lambert generated a jury question on proximate cause; whether the trial court erred in excluding the testimony of an expert witness where co-defendant doctors properly identified the witness but were discharged on a directed verdict thus requiring the remaining defendant hospital to call the witness; and whether an Iowa statute partially abrogating the collateral source rule is unconstitutional as applied to this case.

We present the facts in the light most favorable to the jury verdict for the Lamberts. *Carson v. Mulnix,* 263 N.W.2d 701, 705 (Iowa 1978). Plaintiff Cynthia Lam-

bert was pregnant with the Lamberts' second child. She was under the care of Doctors Leonard H. Boggs and Richard Ratino, who were partners. The Lamberts' first child, born September 29, 1977, required delivery by caesarean section due to indications of fetal distress. That child is alive and well. Because of the first caesarean, Doctors Boggs and Ratino decided to take the second child by caesarean as well.

On February 27, 1979, Cynthia felt a sudden onset of pain at approximately 2:00 p.m. She testified the pain was constant and not like the labor pains she experienced with her first child. She called the doctors' office and asked to speak to Dr. Ratino, her primary care physician. She was told that this was his day off, and was referred to Dr. Boggs. She told Dr. Boggs of the constant pain; he told her to lie down and see if the pain would go away.

Cynthia tried to lie down, but the pain remained. She had been told by Dr. Ratino that she was not to go into labor since she was a repeat caesarean, and so at approximately 4:30 p.m. she called Dr. Ratino at home. He told her that she should call the office. She explained that she had done so, and told him what Dr. Boggs had advised. He told her to try to relax, and to do as Dr. Boggs had instructed.

Cynthia characterized the pain as mild and dull as of approximately 6:30 p.m. Because of the pain, however, she could not get comfortable at home, and so she and her husband went to defendant hospital arriving at approximately 6:40 p.m.

Nurse Althea Raby met them. She was in charge of labor and delivery at the hospital. Cynthia explained her problem. She also told Nurse Raby that she was not supposed to go into labor. At approximately 6:50 p.m. Raby attached an external fetal monitor to Cynthia by means of a belt. The monitor is designed to keep a record of the mother's contractions as well as the fetal heart rate. Cynthia testified that at 7:30 p.m. the formerly mild, dull pain increased to moderate; it remained constant. Nurse Raby telephoned Dr. Boggs, and he told her to have a resident physician evaluate Cynthia and inform him if she appeared to be entering labor. He also told the nurse to call him if Cynthia appeared to be going into labor.

Nurse Raby called Dr. John A. Walck, the resident physician on duty, but was informed that he was with another patient who was in the process of being delivered. Nurse Raby then assigned Nurse Helen Nelson to monitor Cynthia until Dr. Walck arrived.

Nurse Nelson testified that she believed something unusual was going on and suspected that the patient might be going into labor, but she did not call Dr. Boggs. Cynthia's pain continued to increase in intensity, and she repeated that she was not supposed to go into labor.

The Lamberts' experts testified that the monitor showed fetal distress at 7:41 and 8:40 p.m.

At 9:10 Dr. Walck arrived and examined Cynthia. At that time he had only seven weeks of experience in labor and delivery, and stated that he considered the nurses to be more experienced at reading the fetal monitor and determining the patient's wellbeing.

Finally at 9:30 p.m. Cynthia's formerly moderate pain became severe. At this time Dr. Boggs was called. He prescribed valium for Cynthia to calm her and help her relax. He arrived at about 10:00 p.m.

Dr. Boggs examined Cynthia and some moments later ordered that she be prepared for a caesarean section. At 11:07 p.m., Dr. Boggs began the caesarean and at 11:12 p.m. brought forth Travis Lambert. Travis was ashen in color and flaccid from lack of oxygen. Various resuscitory techniques were tried, and after seventeen minutes Travis started to breath. He suffered severe brain damage from oxygen deprivation, caused by a condition called *abruptio placenta*. This condition manifests itself in a tearing away of the placenta from the uterus, interrupting the flow of blood, oxygen, and nutrients from the placenta to the fetus.

After extensive care in various facilities, Travis died. His parents thereafter brought this malpractice action against the doctors and the hospital.

At trial, the district court held as a matter of law that the doctor defendants— Boggs, Ratino, and Walck—were not liable for the death and, with the Lamberts' consent, the court granted the doctors a directed verdict. The Lamberts' case was then against the hospital only.

The jury found the hospital liable for failure of the nurses timely to notify the doctors of Cynthia's condition. The hospital appealed. The Lamberts cross-appealed on the question of the constitutionality of our statute pertaining to the collateral source rule.

I. The issue raised on appeal as to liability does not relate to negligence; it relates to proximate cause. The parties agree that in a malpractice action such as this one, establishment of proximate cause requires expert testimony. *McCleeary v. Wirtz*, 222 N.W.2d 409 (Iowa 1974); *Bradshaw v. Iowa Methodist Hospital*, 251 Iowa 375, 101 N.W.2d 167 (1960). The rule requiring expert testimony has exceptions, but the parties do not disagree that this case comes under the general rule.

To determine the sufficiency of the evidence of proximate cause, we first examine the evidence relating to the charge of negligence against the hospital through its nurses: violation of accepted standards of care when the nurses failed to notify Dr. Boggs before 9:30 p.m. of the current circumstances surrounding Cynthia's condition. We then examine the sufficiency of the evidence that a doctor who had been given the information earlier would have performed the caesarean section sooner and, in consequence, would have saved Travis.

As to negligence, several of the Lamberts' experts indicated that the tearing away in *abruptio placenta* may be of such a slight nature that the fetus is not permanently injured. Then, precipitiously, a break may occur and the fetus is in imminent peril; this state occurs rapidly over a period of six to eight minutes. The Lam-

berts' experts likewise testified that in the present case the actual harmful separation from the uterus could not have occurred more than fifty minutes and probably less than that before Travis was brought forth. If it had occurred earlier, the child would have been stillborn. Thus the Lamberts' experts concede that if the caesarean section had been performed before 10:20 p.m., Travis would not have suffered permanent injury.

This evidence thus narrows our proximate cause inquiry. If the nurses had given Dr. Boggs the information sooner, in performance of the standard of care applicable to them in this type of case, would the doctor have performed the caesarean section before 10:20 p.m. and saved the child?

On the proximate cause issue we find the following testimony by the Lamberts' expert, Dr. Valone:

Mr. Willia (Lamberts' attorney): Doctor, based upon the accepted standard of obstetric practice of an obstetrician prevailing in 1979, if an obstetrician had been telephoned at 7:41 or 8:40 and advised of these findings [regarding the monitor] what would have been done?

Dr. Valone: He would have come to the hospital and examined the patient.

Q. And, again, based upon that same standard, what would the obstetrician have done on his examination? A. In the case of Cynthia Lambert, he would have made the decision to perform the cesarean section and proceeded with that in due course.

Dr. Boggs testified that a caesarean section would normally take fifteen to thirty minutes from the time the doctor determined that surgery was necessary to the time of completion of the surgery—to assemble the surgical team, get the mother into the operating room, and perform the surgery. He also stated that the surgery itself could be done in as short a period as a couple minutes if an emergency appeared, and if necessary it could be performed in the delivery room.

The evidence of the standard of care applicable—prompt notification of the doctor—carries with it some permissible inference that necessary surgery would have been performed sooner; the principal purpose of the requirement that notification be prompt is to permit prompt surgery if indicated. This inference, taken with Dr. Valone's testimony, permitted the jury to find that the doctor probably would have taken the child sooner and thus saved him, if the nurses had fulfilled their applicable standard of care.

■■■ The evidence to the contrary is substantial. Perhaps the strongest contrary evidence is that although Dr. Boggs arrived shortly before 10:00 p.m. he did not take the child until 11:12 p.m., a lapse of over an hour. Despite this contrary evidence, upon viewing the record in the light most favorable to the Lamberts we hold that a jury issue on proximate cause, although not strong, was generated.

II. The second principal issue is whether the trial court erred in excluding the testimony of an expert witness designated by the doctor defendants who were later directed out at trial.

A. Doctors Boggs and Ratino as defendants originally designated Dr. Frank Zlatnick as an expert witness. All parties agree that this designation complied with the rules of civil procedure. In answering an interrogatory, Doctors Boggs and Ratino stated regarding Dr. Zlatnick's testimony:

> Dr. Zlatnick has reviewed the fetal monitor tracing and has found no evidence of fetal distress during the period of time the fetal monitor was in place.

Trial commenced October 4, 1983. On October 10, the trial court directed a verdict in favor of the defendant doctors. On October 12, defendant hospital sought to designate Dr. Zlatnick as its expert witness; the hospital limited his tendered testimony to his review of the fetal monitor strip. The Lamberts objected that allowing Dr. Zlatnick to testify would violate rule 125 of the rules of civil procedure, which requires parties to supplement their an-

swers to interrogatories with the names of experts that they intend to call at trial. The Lamberts also cited the district court's order which required that such supplementation be done by September 27. The trial court held the designation was untimely and excluded Dr. Zlatnick as a witness. The hospital made an offer of proof, and the trial court adhered to its position. The hospital now contends that the trial court erred.

■■■ Rule 125 requires supplementation by giving the names of experts to be called at trial. Failure to comply with the rule may result in sanctions, which are implicit in the rule. *Hubby v. State*, 331 N.W.2d 690, 697 (Iowa 1983). Exclusion of an expert as a witness is the most severe sanction and should not be imposed lightly; other sanctions are available such as a continuation of the trial or limitation of testimony. As the Minnesota Supreme Court stated in *Cornfeldt v. Tongen*, 262 N.W.2d 684, 697 (Minn.1977), "[W]e caution trial courts from readily excluding expert testimony in malpractice cases for inadvertent failure to disclose that testimony during discovery. Exclusion is justified only when prejudice would result." *See also Jenzake v. City of Brookfield*, 108 Wis.2d 537, 322 N.W.2d 516 (1982). The standard applicable to a trial court's decision on such matters is abuse of discretion. *Sullivan v. Chicago & N.W. Transportation Co.*, 326 N.W.2d 320 (Iowa 1982).

The Lamberts seek to uphold their verdict on several bases. They first contend that even if the trial court was in error in excluding Dr. Zlatnick, the decision should stand unless the hospital can show prejudice resulting from the failure to permit the testimony.

In the hospital's offer of proof, Dr. Zlatnick was to testify that the fetal monitor strip reveals no evidence of fetal distress. The Lamberts contend that the evidence presented by Dr. Zlatnick would merely have been cumulative of the evidence given by Doctors Boggs and Ratino and Nurse Papke, and therefore the exclusion was not

prejudicial. The Lamberts themselves, however, point out in another context that the testimony of Doctors Boggs and Ratino might be viewed by the jury as tainted, as both were defendants at the time. Additionally, the only other testimony on the subject for defendants came from the nurse, whose opinions probably would not carry the weight in a medical malpractice action of those of a doctor. Answers to interrogatories show that Dr. Zlatnick's qualifications are not only high but outstanding.

The Lamberts also contend that Dr. Zlatnick's testimony was not properly preserved in the offer of proof because the hospital failed to show the doctor's credentials. Our examination of the record shows abundant compliance with such a requirement, assuming such a requirement exists.

Did the trial court abuse its discretion by excluding Dr. Zlatnick as a witness? We stated in *Hubby:*

> We find an abuse of discretion when such discretion is exercised on grounds or for such reasons clearly untenable or to an extent clearly unreasonable.

*Hubby* at 697 (citation omitted). The purpose of rule 125 is to avoid surprise to litigants and to allow the parties to formulate their positions on as much evidence as is available. *White v. Citizens National Bank of Boone,* 262 N.W.2d 812, 816 (Iowa 1978). In this case the expert in question had been properly designated by the defendant doctors and his testimony regarding the fetal strip had been summarized. The Lamberts could not claim surprise. Additionally, the Lamberts had adequate opportunity to depose the expert prior to trial had they chosen to do so. We conclude that the purpose of rule 125 had been fulfilled and that the Lamberts would not have been prejudiced had Dr. Zlatnick been allowed to testify. At most a reasonable recess within the trial should have been allowed.

The Lamberts also argue that the hospital's failure to require a special verdict from the jury rather than a general verdict waived the error, but their cited cases are inapposite. In one case we held that counsel could not successfully appeal an order for a new trial where answers to special interrogatories to the jury were consistent among themselves but inconsistent with the general verdict. *Dutcher v. Lewis,* 221 N.W.2d 755 (Iowa 1974). This is not an issue here. In another case this court held the defendant could not complain that the trial court submitted a general verdict as to damages where the defendant failed to submit to opposing counsel special interrogatories as to damages as required by statute. *Ransom v. McDermott,* 215 Iowa 594, 246 N.W. 266 (1933). That case is of no applicability in the present situation. The trial court here had ruled on the matter of exclusion of Dr. Zlatnick, and the hospital was not obliged to renew its request at every juncture in order to preserve error.

The hospital did give proper notice that it would call Dr. Mortimer Rosen but, for reasons not shown, did not call him. The Lamberts contend the hospital therefore cannot justifiably complain about the trial court's exclusion of Dr. Zlatnick. The record indicates, however, that Dr. Zlatnick was the significant witness on the fetal monitor, and the reading of the monitor lay at the heart of the case. One of the reasons the Lamberts consented to a directed verdict in favor of the defendant doctors was to exclude witness Zlatnick. The Lamberts' attorney stated to the trial court:

> It became apparent during the time we were putting on our testimony in this case that they were sitting down here in this courtroom, three attorneys in a row, asking the same questions of the same witness and stacking it three times deep on top of the Plaintiff. After we watched this and after we put our expert witnesses on, it was our conclusion that the real culprit in this case in terms of our possibility of reaching a favorable Plaintiff verdict rested against the hospital. We relied on that when Dr. Boggs and Ratino and Dr. Walck made directed verdict motions at the close of our case. In fact, we permitted them to make the

directed verdict motion before we even completed our case.

And, now, and those were done, we did not resist those; and one of the primary reasons we did not resist the directed verdict motions was because we did not want to confront one of their experts, namely, Dr. Zlatnick from the University of Iowa City Hospital.

We made an election as a matter of trial strategy when we called Dr. Thoman that we were not going to pursue our case against the doctors. In fact, in his deposition testimony he testified that Dr. Boggs and Ratino breached a standard of care to this Plaintiff. We relied on that deposition—we relied on a trial decision made upon what experts had been designated by the hospital. And we realized that the doctors were not there at the time to read the strip, but the nursing staff was. Our case was against the hospital. We will deal with their experts that they properly designated, Mortimer Rosen and Kathryn Papke; but I think it certainly is unfair to make us, after we have made a very tactical trial decision, to have to deal with other experts who we have elected not to contend with during the course of this litigation.

From this statement the fact is apparent that a prime reason the Lamberts did not resist the directed verdict was to block out Dr. Zlatnick as a witness in the case—rather than genuine surprise. We do not approve such use of rule 125. The Lamberts did not employ the rule as a shield when a previously unidentified witness was "sprung" on them at trial whom they could not previously have deposed. They used the rule tactically as a sword to eliminate a feared witness of whom they were previously aware. This is a reversion to the former sporting theory of trial as opposed to a search for the truth. We hold that after the doctor defendants left the case and the hospital designated Dr. Zlatnick, the trial court should have given the Lamberts a recess of reasonable duration during the trial if requested, and should have permitted the hospital to call Dr. Zlatnick

as a witness. The error requires a new trial.

B. The hospital argues that the trial court also erred in limiting the testimony of Dr. William Jackson. This issue is not likely to recur on retrial as new designations can be filed. We decline to address it.

III. The third issue is whether section 147.136 of the Iowa Code is constitutional as applied to the present case. This issue is likely to recur on retrial, and we therefore consider it. Section 147.136 abrogates the collateral source rule in specified situations involving medical and hospital malpractice claims.

We found section 147.136 to be constitutional in *Rudolph v. Iowa Methodist Medical Center*, 293 N.W.2d 550 (Iowa 1980). The Lamberts contend that this determination should be reconsidered since *Rudolph* did not involve constitutionality when a hospital is self-insured, as this one is.

We must determine whether the failure of section 147.136 to distinguish between insured and self-insured institutions violates the equal protection clause of the United States Constitution. The appropriate standard for consideration is the rational basis test. *Rudolph*, at 557. We note that a party challenging the constitutionality of such a statute has a heavy burden. *Rudolph*, at 559.

In *Rudolph* we stated the legislative purpose in enacting section 147.136 as follows:

> It thus appears that the legislature's purpose in enacting section 147.136 was to reduce the size of malpractice verdicts by barring recovery for the portion of the loss paid for by collateral benefits. The verdicts would presumably result in reduction in premiums for malpractice insurance, making it affordable and available, helping to assure the public of continued health care services.

*Id.* at 558.

The Lamberts argue that defendant hospital does not pay malpractice insurance premiums, and therefore the legislature could not have a legitimate purpose in precluding the Lamberts from collecting from

collateral sources and from the hospital also.

We think that the Lamberts' focus is on the wrong portion of the stated intent. The legislature's intent was to help assure the public of continued health care services at affordable rates. If defendant hospital does not have the benefit of section 147.136, it must adjust its hospital rates accordingly, striking at the heart of the purpose of the legislature in enacting the section. We are thus unable to agree with the Lamberts that the state has no legitimate interest under the circumstances of this case. We hold section 147.136 is constitutional as applied here.

We return the case to district court for a new trial between the Lamberts and the hospital. We assess half of the appeal costs to the Lamberts and half to the hospital.

REVERSED ON DEFENDANT HOSPITAL'S APPEAL, AFFIRMED ON PLAINTIFFS' CROSS APPEAL.