PREFERRED MARKETING
ASSOCIATES CO.,
Appellee,

v.

HAWKEYE NATIONAL LIFE
INSURANCE CO., Appellant.

No. 89–55.

Supreme Court of Iowa.

March 21, 1990.

Gene R. La Suer and Diane M. Stahle of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, for appellant.

F.E. Ebersold and Robert J. Laubenthal of Smith, Peterson, Beckman & Willson, Council Bluffs, and Donald G. Beattie of Skinner, Beattie & Wilson, P.C., Altoona, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, CARTER and NEUMAN, JJ.

McGIVERIN, Chief Justice.

Plaintiff Preferred Marketing Associates Co. (PMA) is an independent insurance agency which represented defendant Hawkeye National Life Insurance Co. (Hawkeye). In June 1984, Hawkeye terminated its contracts with PMA and certain individuals connected with PMA. In July 1986, PMA filed this law action, essentially alleging that Hawkeye had breached its contract with PMA and had tortiously interfered with PMA's business.

The matter proceeded to trial. Over Hawkeye's objection, the district court allowed an expert witness to testify regarding calculation of PMA's damages, despite the fact that PMA had not designated the expert as a witness until one week prior to trial.

After overruling portions of Hawkeye's motion for a directed verdict, the court instructed the jury on several of PMA's claims. The jury returned special verdicts for PMA on two of the claims, awarding PMA $250,000 for breach of contract and $100,000 for tortious interference with prospective contractual relations. Hawkeye's

posttrial motions were overruled. The court entered judgment on the verdicts, with interest from the date the suit was filed.

Hawkeye has appealed, arguing that the court erred: 1) in allowing the expert witness to testify; 2) in overruling the motion for a directed verdict on the breach of contract and the tortious interference with prospective contractual relations claims, and; 3) in awarding prejudgment interest under Iowa Code section 535.3 (1987).

The court granted Hawkeye's motion for a directed verdict on some of PMA's claims. PMA has cross-appealed from this ruling with respect to its claims of unconscionability of contract, conversion, and negligent breach of contract.

Our review is for correction of errors at law. Iowa R.App.P. 4. We conclude that Hawkeye's motion for a directed verdict on the claim of tortious interference with prospective contractual relations should have been granted. The judgment on that claim, therefore, is reversed. In all other respects, we affirm.

I. *Background facts and proceedings.* PMA is an Iowa corporation which was formed by Gary Kragel and Bill Bitters in 1980. In 1981, Bitters transferred his ownership interest in PMA to Kragel but continued to be employed by PMA as an executive. Hawkeye is an Iowa-based insurance company.

A. *The contracts.* In November 1981, PMA and Hawkeye entered into a written "representative's appointment" contract by which PMA became a representative of Hawkeye. Kragel and Bitters entered into identical contracts with Hawkeye in their personal capacities. Each representative's appointment provided that either party could terminate the appointment by written notice to the other party.

Under the terms of each appointment, Hawkeye would pay the representative a commission on each Hawkeye policy sold by the representative. In addition, paragraph 17 of each appointment specified the general terms under which Hawkeye would pay "renewal commissions" to the representative even after the appointment had been terminated. "Renewal commissions"

are commissions paid to an agent by an insurer when a policyholder solicited by the agent for the insurer renews its insurance policy by paying the insurer a renewal premium.

The Hawkeye sales force was organized as a system of hierarchies. The agent or "representative" was at the bottom of each hierarchy, with a "district manager," "regional director," "state director," and "executive director" at progressively higher levels. The top position in each hierarchy was that of "marketing director." Each position had a different commission schedule and written contract with Hawkeye. The contracts for the positions above the representative level were actually addendums to the representative's appointment, and the terms of the representative's appointment remained in effect unless expressly modified by the addendum.

In May 1982, PMA was appointed marketing director. As marketing director, PMA was entitled to a commission on every insurance policy sold by the soliciting representatives in the PMA hierarchy. This was known as an "overwriting commission." In return, PMA recruited, trained and supervised the agents and agencies under it in the PMA hierarchy. Those agents and agencies had separate written contracts with Hawkeye and no written contracts with PMA. Hawkeye retained the right to assign and reassign soliciting representatives to and from the PMA hierarchy.

B. *The terminations and events thereafter.* The PMA hierarchy soon became Hawkeye's top sales force. Late in 1983 and early in 1984, however, the relationship between Hawkeye and PMA soured. PMA became dissatisfied with its compensation, and Hawkeye learned that PMA had taken preliminary steps to terminate its relationship with Hawkeye and to affiliate with one of Hawkeye's competitors. PMA threatened to take some of the soliciting representatives in the PMA hierarchy along with it when it left Hawkeye. On May 31, 1984, Hawkeye notified Kragel, Bitters and PMA that the contracts between them were terminated as of June 1,

and made an accounting of the transactions between them.

Upon PMA's termination, Hawkeye demanded that PMA repay approximately $18,000 that Hawkeye had loaned out in 1983 on notes signed by Kragel and Bitters. The parties disagreed as to whether these loans were made to Kragel and Bitters personally, or to PMA. Hawkeye took the position that the loans were made to PMA. Thirty days later, the outstanding balance of the debts was approximately $8,000. Acting pursuant to a paragraph of PMA's representative's appointment contract that gave Hawkeye the right to terminate renewal commissions in the event PMA failed to repay its debts to Hawkeye within thirty days of the post-termination accounting, Hawkeye refused to pay PMA any renewal commissions.

The evidence conflicted over the events of the next few months. PMA's evidence tended to show that in late 1984, Hawkeye representatives contacted Hawkeye policyholders who, in the past, had purchased their policies from representatives in the PMA hierarchy, and attempted to persuade them to replace their PMA–Hawkeye policies with new Hawkeye policies. In response, PMA representatives called on the same policyholders and, in numerous instances, replaced PMA–Hawkeye policies with policies of another insurance company. PMA's evidence was that those PMA–Hawkeye policyholders were the only ones contacted by PMA.

Hawkeye's evidence tended to show that in the fall of 1984, PMA started replacing PMA–Hawkeye policies with those of another insurance company. According to Hawkeye, only after it learned of this did it attempt to replace PMA–Hawkeye policies with its own new policies. Several PMA–Hawkeye policies were, in fact, replaced with new Hawkeye policies.

It is not disputed that many of the representatives who had been in the PMA hierarchy remained contracted to Hawkeye even after PMA, Kragel and Bitters were terminated. It also is not disputed that thousands of PMA–Hawkeye policies remained in place after the terminations and were still in place at the time of trial.

C. *Proceedings in the district court.* In July 1986, PMA filed this law action against Hawkeye. In October 1987, the district court ordered that PMA designate its experts by March 31, 1988, and that Hawkeye designate its experts by April 29, 1988. Trial was set for August 1, 1988, but was rescheduled to November 7.

On October 31, 1988, PMA amended its two-year-old answer to Hawkeye's interrogatories, revealing for the first time that it intended to call an expert witness at trial. Hawkeye moved to exclude this witness from testifying, but the motion was denied on the first day of trial. The witness, an economics professor, was allowed to testify concerning the time value of money and to express an opinion as to the amount by which PMA's lost renewal commission damages should be discounted to account for interest and inflation.

At the close of all the evidence, the court granted Hawkeye's motion for a directed verdict on four of PMA's eight claims: negligent termination of contract, unconscionability of certain terms of the contract, conversion, and negligent breach of contract.

The court otherwise overruled Hawkeye's motion for a directed verdict and instructed the jury on PMA's claims of breach of contract, tortious interference with existing contractual relations, tortious interference with prospective contractual relations, and fraudulent misrepresentation. The jury also was instructed that it could assess punitive damages.

The jury returned special verdicts awarding PMA $250,000 for breach of contract and $100,000 for tortious interference with prospective contractual relations. The jury found for Hawkeye on the other submitted claims and on the issue of punitive damages. Hawkeye's posttrial motions were overruled and judgment was entered against Hawkeye for $350,000, with interest from the date the suit was filed.

Hawkeye appealed and PMA cross-appealed.

■ II. *The expert witness's testimony.* The district court allowed PMA to call an expert witness at trial. Hawkeye had specifically inquired about PMA's intentions concerning expert witnesses by interrogatory—which PMA answered negatively—in 1986. The announcement that PMA had changed its mind came only one week before trial and seven months after the court-imposed deadline for designating experts had passed. Hawkeye argues with some force that the court erred in allowing the witness to testify and, therefore, that we should reverse and remand for a new trial.

Iowa Rule of Civil Procedure 125(c) states:

*Duty to supplement discovery as to experts.* If a party expects to call an expert witness when the identity or the subject of such expert witness' testimony has not been previously disclosed in response to an appropriate inquiry directly addressed to these matters, such response must be supplemented to include [the name and address of the expert, the subject of the expert's testimony, the expert's qualifications, the mental impressions and opinions held by the expert, and the underlying facts which form the basis of the expert's opinion] as soon as practicable, but in no event less than thirty days prior to the beginning of trial except on leave of court. *If [the information is] not disclosed in compliance with this rule, the court in its discretion may exclude or limit the testimony of such expert, or make such orders in regard to the nondisclosure as are just.*

(Emphasis added.) We will not disturb a district court's decision under this rule unless the court abused its discretion. *See, e.g., Lambert v. Sisters of Mercy Health Corp.*, 369 N.W.2d 417, 421 (Iowa 1985). We find an abuse of discretion only when discretion is exercised on grounds clearly untenable or to an extent clearly unreasonable. *Id.* at 422.

This is a close case. Were we deciding the matter in the first instance we might well exclude expert testimony thrust on the defendant at so late a date. Noncompliance with discovery rules and discovery orders should not be tolerated. Often it is not tolerated. *See, e.g., Farley v. Ginther*, 450 N.W.2d 853, 856 (Iowa 1990) (upholding district court's exclusion of expert testimony because of party's failure to abide by discovery order); *Sullivan v. Chicago & Northwestern Transp. Co.*, 326 N.W.2d 320, 324 (Iowa 1982) (upholding district court's exclusion of expert testimony because of party's failure to abide by discovery rule); *M–Z Enterprises, Inc. v. Hawkeye–Security Ins. Co.*, 318 N.W.2d 408, 414 (Iowa 1982) (same). The late designation of PMA's expert was in violation of both a discovery order and a discovery rule. Nevertheless, we cannot say that the district court abused its broad discretion in allowing the expert to testify.

In ruling on this matter, the court stated that it would: 1) require PMA to make the witness available to Hawkeye before he testified; 2) allow Hawkeye whatever time it needed to talk with the witness; 3) allow Hawkeye whatever time it needed to call a rebuttal witness without any prior notice to PMA; and 4) recess until such time as Hawkeye could produce a rebuttal witness. In addition, the two-week trial was to be interrupted by a three-day weekend. Finally, the court limited the witness's testimony to an explanation of the effect of interest and inflation on renewal commissions allegedly due PMA in the future. The district court could reasonably believe that its orders would rectify any imbalance caused by PMA's tactics.

■ Hawkeye also asserts that the expert's opinion was flawed because it was based on a faulty assumption. We think this argument goes to the weight to be given the opinion, not to its admissibility.

Under these circumstances, we narrowly find no abuse of discretion in allowing the expert to testify.

III. *The motion for a directed verdict.* Both parties contend that the district court erred in ruling on Hawkeye's motion for a directed verdict. In considering this question, we view the evidence in the light most favorable to the party opposing the motion.

Iowa R.App.P. 14(f)(2). If reasonable minds could differ on an issue of fact, then the issue is for the jury.

■ A. *The breach of contract claim.* The gist of PMA's breach of contract claim is that Hawkeye breached its contract with PMA by wrongfully refusing to pay renewal commissions to PMA following termination of the contract. The district court overruled Hawkeye's motion for a directed verdict on this claim, based on lack of substantial evidence, and submitted the claim to the jury. The jury returned a special verdict of $250,000 for PMA. Hawkeye argues that the court erred in submitting the claim to the jury.

We disagree. Viewing the evidence in the light most favorable to PMA, we think that a jury question was engendered as to whether Hawkeye breached the contract.

Hawkeye admits that it refused to pay PMA renewal commissions, but defends the refusal by pointing to its contractual right to refuse to pay renewal commissions to PMA in the event that PMA failed to repay its indebtedness to Hawkeye within thirty days of the post-termination accounting. PMA concedes that Hawkeye had this right but argues that the debts in question were personal obligations of Kragel and Bitters, and not the obligation of PMA. Hawkeye argues that under its contract with PMA, PMA was responsible for the debts of Kragel and Bitters, in any event. Hawkeye concludes that it rightfully refused to pay renewal commissions to PMA.

The right of an insurance agent to commissions, salary, or other compensation from the insurer, when based on a contract, is dependent on the terms of the contract. *Mopper v. Circle Key Life Ins. Co.,* 172 N.W.2d 118, 124 (Iowa 1969). This rule applies to renewal commissions. *See id.; McPherrin v. Sun Life Assurance Co.,* 219 Iowa 159, 257 N.W. 316 (1934). It also is possible to state a cause of action for recovery of renewal commissions on a theory of unjust enrichment, but PMA has made no such claim in this case. *See Glass v. Minnesota Protective Life Ins. Co.,* 314 N.W.2d 393, 397 (Iowa 1982).

The representative's appointment contracts between Hawkeye and Kragel, Hawkeye and Bitters, and Hawkeye and PMA provided that:

In the event of termination of this appointment for any reason, an immediate accounting shall be made by the Company [Hawkeye], and all indebtedness, including all advances made by the Company to the Representative, shall be due and payable in their entirety without demand. *Failure of Representative to pay indebtedness within 30 days of the earlier of receipt of such accounting or the expiration of 5 days from the date of mailing same, shall annul all rights to any commissions provided by this appointment and supplements hereto, and Representative shall not be entitled to the benefits provided by Paragraph 17 hereof.*

(Emphasis added.) We will assume, without deciding, that this clause may be strictly enforced.

An accounting was provided by Hawkeye on or before June 1, 1984, the date of termination. Thirty days later, it appears that someone still owed Hawkeye approximately $8,000. The evidence conflicted over whether the money owed Hawkeye had been loaned to PMA or to Kragel and Bitters personally. The jury could have found the latter.

Assuming that the money was loaned to Kragel and Bitters personally, the question becomes whether, as marketing director in charge of Kragel and Bitters, PMA was responsible for their debts. PMA's marketing director's appointment contract provided:

Marketing Director recognizes that Hawkeye from time to time grants advances to Regional Directors, District Managers and Representatives ["soliciting representatives"] against commissions potentially due said [soliciting representatives.] ... *In the event that said Soliciting Representatives fail to earn said commissions to offset said advances, same become indebted to Hawkeye for any deficit. Marketing Director hereby unconditionally guarantees any*

*said deficits of Marketing Director's Soliciting Representatives and agrees to indemnify Hawkeye for same.*

*It is agreed that Hawkeye shall have the right to payment by Marketing Director of any such deficit immediately upon its existence....*

(Emphasis added.)

When Kragel and Bitters failed to repay their indebtedness to Hawkeye within thirty days of their termination and the accounting, that is, by July 1, 1984, they lost the right to renewal commissions under their own representative's appointment contracts. PMA then became obligated to pay Hawkeye the "deficits."

The debt owed Hawkeye on July 1 was approximately $8,000, having been reduced by roughly $10,000 since the terminations. There were thousands of PMA–Hawkeye policies on Hawkeye's books at that time, and most of them were expected to yield renewal premiums to Hawkeye. There was evidence that PMA's renewal commissions alone could total as much as $500,000 over the term of the policies. Hawkeye was assured of being able to deduct the $8,000 from PMA's renewal commissions very soon, and stood to profit handsomely in the future from the PMA–Hawkeye policy renewal premiums.

We think that in light of all the evidence, it was for the jury to decide whether PMA's failure to separately pay the $8,000 to Hawkeye by July 1 was a material failure of performance in relation to the timing and amounts of money involved, and whether Hawkeye breached the contract in refusing to pay renewal commissions to PMA. The jury was properly instructed on the factors it should consider in deciding whether PMA's failure to separately pay the $8,000 to Hawkeye was a material failure of performance which would bar PMA's recovery. *See* Iowa Uniform Jury Instruction 2400.7 (1988) (listing factors relevant to materiality of breach).

■ Hawkeye further argues that under another clause of its contract with PMA, it had the right to refuse to pay renewal commissions to PMA in the event that PMA replaced any PMA–Hawkeye policies with policies of another insurance company. PMA admits that it replaced some PMA–Hawkeye policies in late 1984, but there was evidence that it did so only after Hawkeye first attempted to replace the same policies with new Hawkeye policies. Moreover, this activity took place months after Hawkeye had first refused to pay renewal commissions to PMA on the grounds that PMA did not immediately pay the debts of Kragel and Bitters. Again, we think it was for the jury to decide whether Hawkeye breached the contract by refusing to pay renewal commissions, and whether PMA materially breached its end of the bargain by contacting only those policyholders who had already been contacted by Hawkeye.

The district court correctly overruled Hawkeye's motion for a directed verdict on this claim.

■ B. *The tortious interference with prospective contractual relations claim.* The gist of PMA's tortious interference with prospective contractual relations claim is that Hawkeye, by terminating its contract with PMA, frustrated PMA's expectation of contractual relations with soliciting representatives in the PMA hierarchy and with persons who would have purchased Hawkeye policies from those representatives. By this theory PMA sought the marketing director's share of commissions on Hawkeye policies that would have been sold by representatives in the PMA hierarchy in the future, if the PMA hierarchy had continued to exist.

The district court overruled Hawkeye's motion for a directed verdict on this claim and submitted the claim to the jury, which returned a special verdict of $100,000 for PMA. Hawkeye argues that the court erred by submitting the claim to the jury. We agree.

The cause of action recognized in Iowa for interference with prospective contractual relations closely resembles that described by Restatement (Second) of Torts section 766B (1977). *See, e.g., Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 195 (Iowa 1990) (discussing Restatement (Sec-

ond) of Torts § 766(B). To recover on this claim in Iowa, the plaintiff must prove:

1. that it had a prospective contractual or business relationship;

2. that defendant knew of the prospective relationship;

3. that defendant intentionally and improperly interfered with the relationship;

4. that defendant's interference caused the relationship to fail to materialize, and;

5. the amount of resulting damage.

*See, e.g., Nesler*, 452 N.W.2d at 198–99 (approving Iowa Uniform Jury Instruction 1200.2 on elements of this tort).

Hawkeye assails the submission of this claim on several grounds, but we need address only one. Assuming for the sake of argument that this cause of action is otherwise broad enough to protect PMA's expectancy of profit from future Hawkeye policyholders, we think Hawkeye was entitled to a directed verdict on the claim because PMA presented no evidence that Hawkeye improperly interfered with PMA's prospective contractual or business relations.

The contract between Hawkeye and PMA gave either party the right to terminate the relationship at will. Hawkeye exercised this right, thereby cutting off PMA's expectancy of profit from Hawkeye policies sold by any Hawkeye representative in the future. Hawkeye's motive was to rid itself of an uncooperative marketing director, not to damage PMA's business. That motive is not improper. Improper motive, however, is an essential element of this tort. *See id.* at 199 (tort of interference with prospective contractual or business relationships requires showing that actor's predominant purpose was to injure or destroy plaintiff's business); *Harsha v. State Savings Bank*, 346 N.W.2d 791, 799 (Iowa 1984) (same); *Farmers Cooperative Elevator, Inc., Duncombe v. State Bank*, 236 N.W.2d 674, 679–82 (Iowa 1975) (bank not liable for damage to plaintiff's business resulting from bank's actions, where bank acted to protect its own position, not to destroy plaintiff's business).

There was no evidence that Hawkeye improperly interfered with prospective contractual or business relationships of PMA. Hawkeye did no more than it was entitled to do under its contract with PMA, that is, terminate the contract at will. Of course this destroyed PMA's ability to profit from future Hawkeye policyholders, but that result was incidental to the pursuit of Hawkeye's own ends by proper means. As such, it is not actionable. *See Page County Appliance Center, Inc. v. Honeywell, Inc.*, 347 N.W.2d 171, 177–78 (Iowa 1984).

Hawkeye's motion for a directed verdict on this claim should have been granted.

C. *The unconscionability claim.* We have affirmed the judgment for PMA on the breach of contract claim. Consequently, we need not address PMA's contention on cross-appeal that the district court erred by directing a verdict for Hawkeye on the claim that certain portions of the representative's appointment contract are unconscionable and unenforceable.

D. *The conversion claim.* The gist of PMA's conversion claim is two-fold: first, that Hawkeye converted money that belonged to PMA by refusing to pay renewal commissions due PMA, and; second, that Hawkeye converted a sales force that belonged to PMA by retaining the services of some of the representatives in the PMA hierarchy after PMA was terminated. On cross-appeal, PMA argues that the district court erred by directing a verdict for Hawkeye on the conversion claim.

■ We need not consider whether the claim of conversion should have been submitted on PMA's first theory, because any recovery that might arise from that theory would duplicate the recovery for breach of contract. PMA cannot be compensated twice for the same damages. *See Team Central, Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 923–26 (Iowa 1978).

■ PMA's second theory is not supported by the evidence. PMA had no possessory right to the soliciting representatives in the PMA hierarchy, nor did it have a contractual interest in the representatives' services which Hawkeye allegedly misappropriated. We recently defined con-

version as "the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988). Assuming that conversion would otherwise lie for misappropriation of a contractual interest, the evidence was that the soliciting representatives were contracted to Hawkeye, not PMA. Hawkeye did not convert the representatives or the right to their services.

The district court correctly directed a verdict for Hawkeye on this claim.

E. *The negligent breach of contract claim.* PMA further argues on cross-appeal that the district court erred by directing a verdict on the claim which PMA now styles "negligent breach of contract." This claim boils down to an assertion that Hawkeye's breach of contract, discussed in division IV(A) of this opinion, amounts to negligence.

We have recognized that under some circumstances, breach of a contractual duty may give rise to an independent action in tort. *See, e.g., Duke v. Clark,* 267 N.W.2d 63, 68 (Iowa 1978) (tenant versus landlord); *Giarratano v. Weitz Co., Inc.,* 259 Iowa 1292, 1305, 147 N.W.2d 824, 832 (1967) (employee of subcontractor versus general contractor with control over workplace and safety). We have rejected the suggestion that *every* breach of contract gives rise to an action in tort. *See M & W Farm Serv. Co. v. Callison,* 285 N.W.2d 271, 276 (Iowa 1979). Only where a duty recognized by the law of torts exists between the plaintiff and defendant distinct from a duty imposed by the contract will a tort action lie for conduct in breach of the contract. As Prosser stated:

> [I]f a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not.

W. Prosser, *Handbook of the Law of Torts* § 33, at 205 (1st ed. 1941). *See also* W. Prosser, *The Law of Torts* § 92 (W.P. Keeton 5th ed. 1984 & Supp.1988) (maintaining distinction); 57A Am.Jur.2d *Negligence* § 119 (1989) ("Ordinarily, a breach of contract is not a tort.... [But] negligent performance of a contract may give rise to an action in tort, if the duty exists independently of the performance of the contract.") (citations omitted); *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956) (recognizing rule); *Layman v. Braunschweigische Maschinenbauanstalt, Inc.,* 343 N.W.2d 334 (N.D.1983) (same); *Landwehr v. Citizens Trust Co.,* 110 Wis.2d 716, 329 N.W.2d 411 (1983) (same).

There is no relationship between Hawkeye and PMA which gives rise to a legal duty to pay renewal commissions, independent of the contract between them. PMA's cause of action for Hawkeye's refusal to pay renewal commissions lies in contract, not in tort.

The district court correctly directed a verdict for Hawkeye on this claim.

IV. *Prejudgment interest.* The district court entered judgment for PMA in the amount of the jury verdict, plus interest at the rate of ten percent per year from the date the suit was filed. *See* Iowa Code § 535.3 (1987). Hawkeye argues that the court's award of prejudgment interest on a verdict for future renewal commissions is not authorized by the statute. This issue, however, was not raised before the district court. Accordingly, we will not consider it here. *See, e.g., Kroblin v. RDR Motels, Inc.,* 347 N.W.2d 430, 434 (Iowa 1984) (supreme court ordinarily will not consider an issue that is raised for the first time on appeal).

V. *Disposition.* That portion of the district court's judgment relating to PMA's claim for tortious interference with prospective contractual relations is reversed. In all other respects, the judgment is affirmed. The case is remanded for entry of a new judgment consistent with this opinion.

Costs on appeal are taxed one-half to each party.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.