Robert J. BURKE, Appellee,

v.

HAWKEYE NATIONAL LIFE
INSURANCE COMPANY,
Appellant.

No. 89–1294.

Supreme Court of Iowa.

June 19, 1991.

As Amended on Denial of Rehearing
Sept. 12, 1991.

Diane M. Stahle, Gene R. La Suer, and Stanley J. Thompson of Davis, Hockenberg, Wine, Brown, Koehn & Shors, P.C., Des Moines, for appellant.

Sam S. Killinger of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser and David L. Reinschmidt and Stanley E. Munger of Munger Law Firm, Sioux City, for appellee.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, NEUMAN, and SNELL, JJ.

NEUMAN, Justice.

This suit began as a breach of contract action against an insurance company by one of its former independent agents. As originally pled, the suit also claimed that the company interrupted "plaintiff's commercial relationships with others." Four years later, in the midst of a bench trial, the agent was allowed to amend his petition to add a claim for actual and punitive damages caused by the company's alleged tortious interference with prospective business relations. The district court then awarded the agent $117,400 in actual damages and $250,000 punitive damages. On the company's appeal from these awards we affirm in part, reverse in part, and remand for entry of a corrected judgment.

I. The dispute centers on a customer list developed by plaintiff Bob Burke over the fourteen years he sold life insurance as an independent agent for defendant Hawkeye National Life Insurance Company. In fact, Burke developed the customers, not the list. The list was generated at the company's home office in Des Moines in connection with an aggressive scheme to market a new insurance product in late 1981 and early 1982. Unbeknownst to Burke, Hawkeye released the list to newly-hired agents in Burke's territory a month before Hawkeye summarily terminated Burke's agency relationship with the company.

For many years prior to his termination, Burke had been one of Hawkeye's star salesmen. His success was routinely heralded at company banquets and rewarded with expense paid vacations. Over the years he wrote over 2000 Hawkeye policies. Burke's loyal customers were familiarly described at trial as his "nest."

As an independent agent, Burke was licensed to do business with a number of companies, depending on the insurance needs of his customers. He was encouraged to secure renewals and new policies for Hawkeye, however, because of the "vesting" provision of his agency contract. The contract provided that, even upon termination of the agency relationship, the agent would continue to receive renewal

commissions on policies written so long as renewal premiums received by the company in any twelve-month period equaled or exceeded $10,000. These "vested renewals" were touted by company officials as security for retired agents.

In the early 1980s the amount of new business generated by Burke for Hawkeye declined. The decline was fueled by several factors. First, Burke suffered a temporary health-related disability. This disability, combined with the knowledge that he had developed a secure "nest" of customers, prompted Burke to cut back on his production. Perhaps more importantly, however, the insurance industry was generally in a state of flux. The products offered by Hawkeye were outdated and less competitive than products offered by other companies Burke represented. While retaining his loyalty to Hawkeye on renewals, Burke tended to place new business elsewhere.

Hawkeye was not insensitive to the industry-wide changes that were impacting its agents' sales. In late 1981 and early 1982 it contracted with Preferred Marketing Associates (PMA) to design and market a new life insurance product called the "twelve-by-twelve." The financial return on this new policy was far superior to former products and created an incentive for policyholders to cash in former policies to invest the cash values in the new product. As part of its deal with Hawkeye, PMA furnished a sizable sales force to market the new product.

Burke sold twenty-three of Hawkeye's twelve-by-twelve policies in the first two months they were marketed. He soon learned, however, that other PMA salesmen were calling on "his" customers in Plymouth County. Burke angrily confronted the company's agency director about this development. Although the evidence is contradictory whether Hawkeye crossed out or highlighted Burke's customers on a list of Hawkeye policyholders given to the PMA sales force, it is clear that Burke's customers were actively solicited and ultimately canceled policies originally written by Burke. As a result Burke's renewal commissions decreased markedly. Burke's agency relationship with Hawkeye was terminated the day following his complaint about the solicitation of his business.

Burke sued Hawkeye for breach of contract, claiming the company's distribution of his customer list violated his right to vested renewals under Hawkeye's agency contract. Hawkeye defended on the ground that Burke's contract was terminable at will by either party, and that Hawkeye had every right to contact its policyholders both before and after Burke's termination.

The district court found that just before and immediately following Burke's termination, Hawkeye agents replaced approximately 215 policies written by Burke, thereby eliminating not only his vested renewals from those policies, but reducing the opportunity for sizable first-year commissions on the new policies, subsequent renewal commissions and service fees. The court awarded Burke $65,000 for lost sales commissions, $8000 for renewal commissions, $9400 in service fees, and $25,000 for loss of business opportunity. Because the court found Hawkeye's actions were done deceptively with malice towards Burke, it entered judgment for punitive damages of $250,000.

II. The principal question on appeal is whether Hawkeye's distribution of Burke's customer list either violated the parties' agency contract or amounted to a tortious interference with Burke's business relationships. Hawkeye contends the record does not support recovery, legally or factually, on either theory. Moreover, Hawkeye charges the trial court abused its discretion by allowing a midtrial amendment to allege punitive damages four years after the case was filed.

Our review is for the correction of errors at law. The district court's findings of fact have the effect of a special verdict and are binding on us if supported by substantial evidence. Iowa R.App.P. 14(f)(1); *Waukon Auto. Supply v. Farmers & Merchants Sav. Bank*, 440 N.W.2d 844, 846 (Iowa 1989).

III. The weight of authority clearly indicates that an independent insurance agent's right to renewal commissions must arise from a contract:

> Generally an insurance agent is considered to have no vested rights in commissions on renewal premiums, but rather his right to be paid such commissions must be based entirely upon the terms of his contract....

16B J. Appleman, *Insurance Law and Practice* § 9001, at 236 (1981). We adhered to this rule in *McPherrin v. Sun Life Assurance Company of Canada,* 219 Iowa 159, 257 N.W. 316 (1934), where we stated:

> [The agent's] right to renewal commissions is in no sense a vested right. It is a contractual right and can be enforced only upon an affirmative showing by appellant that he has fulfilled and carried out the terms of the contract relied upon....

*Id.* at 161, 257 N.W. at 317; *accord Preferred Marketing Assocs. Co. v. Hawkeye Nat'l Life Ins. Co.,* 452 N.W.2d 389, 394 (Iowa 1990); *see also Baker v. Penn Mut. Life Ins. Co.,* 788 F.2d 650, 659 (10th Cir. 1986) ("Plaintiff's right to vestings exists solely because of and is circumscribed by his contract with Penn Mutual, which is the reference point for determining the rights and duties of the parties."); *Geiss v. Northern Ins. Agency,* 153 N.W.2d 688, 690 (N.D.1967) (same); *Lee v. Wisconsin Physicians Serv.,* 76 Wis.2d 353, 356–58, 252 N.W.2d 24, 26 (1977) (same).

■ The record reveals that Hawkeye continued to pay renewal commissions pursuant to the contract on those policies remaining in force after Burke was terminated. Burke convinced the district court, however, that he "owned" his list of customers for purposes of writing and replacing additional business. Thus to the extent that Hawkeye interfered with that ownership interest by writing replacement policies that eliminated Burke's renewal commissions, Burke claims Hawkeye violated his vesting privileges under the contract.

The weak link in Burke's contract argument is the lack of any binding agreement between the parties, written or oral, concerning "ownership" of Burke's customers. There appears little dispute that the written contract is silent on the question. Clearly the policyholder information was as accessible to Hawkeye as to Burke. In the absence of an agreement giving an agent the exclusive right to use such information, we have held both agent and principal are free to solicit insurance business based on customer records contained in their respective files. *Ballagh v. Polk–Warren Mut. Ins. Ass'n,* 257 Iowa 1334, 1342–44, 136 N.W.2d 496, 501 (1965).

■ As for any oral agreement between the parties, its terms and evidence of its breach are ordinarily questions for the trier of fact. *Dallenbach v. Mapco Gas Prods., Inc.,* 459 N.W.2d 483, 486 (Iowa 1990). Although the district court made a finding that "the customer list belonged to the plaintiff" as a matter of "written and oral contracts," we can find no substantial evidence in the record to support those conclusions. To sustain proof of an oral contract, the terms must be sufficiently definite for a court to "determine with certainty the duty of each party and the conditions relative to performance." *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977). Evidence of Burke's reliance on industry custom and vague company promises about the "nest egg" he was building simply does not rise to the level of proof necessary to establish an oral contract. This evidence was relevant, however, to Burke's claim of intentional interference with existing and prospective business relations, to which we now turn.

IV. Although Hawkeye was not contractually bound to refrain from interfering with Burke's customer base, Burke offered persuasive evidence of industry-wide custom that made the practice unacceptable. This "hands-off" policy recognizes that while the company furnishes the product, the agent provides the customers; that customer loyalty to the company is fostered through agency relationships; and that agents are recruited and retained on the prospect of generating a customer base that—if left undisturbed—will provide years of renewal premiums for the compa-

ny and renewal commissions for the agent. Within this framework, agents protect their vested renewals by refraining from deliberately replacing company policies with competitors' products. And companies assume a corresponding duty not to solicit new business from policyholders unless they are "orphaned," that is, no longer serviced by an active agent.

Despite this established practice, the evidence reveals that in its zeal to market its new product, Hawkeye sent PMA agents to call on Burke's customers in February and March 1982, while Burke was still under contract with Hawkeye. The customer list gave these agents valuable information about the age, premium cost, and available cash values of current policies. The PMA agents who testified on Burke's behalf were clearly uneasy about the solicitation. Burke had spent many years developing loyal Hawkeye customers. Thus one PMA agent described the ease of using Burke's list to sell the new Hawkeye product as akin to "shooting fish in a barrel." Another agent plainly felt he was "stealing from Bob Burke."

The district court found this evidence sufficient to award Burke damages on theories of both intentional interference with *existing* contracts and intentional interference with *prospective* business relationships. Consideration of these causes of action was allowed, over Hawkeye's objection, pursuant to a motion made on the fourth day of trial to conform the pleadings to the proof. *See* Iowa R.Civ.P. 106. On appeal, Hawkeye does not quarrel with the allowance of the amendment except as a predicate to Burke's claim for punitive damages. Hawkeye merely argues that the evidence is insufficient to support recovery on these theories.

■ We recently compared the closely-related elements of these two causes of action in *Nesler v. Fisher and Co., Inc.*, 452 N.W.2d 191, 196–99 (Iowa 1990). Intentional interference with a contract requires proof that (1) plaintiff had a contract with a third party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the con-

tract; (4) the interference caused the third party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted. *Id.* at 198. Proof of intentional interference with a *prospective* contract or business relationship essentially calls for evidence on the same elements relative to *future* business. *See id.* at 198–99.

■ The primary distinction between the two causes of action is the nature and degree of proof required on the element of motive. In a claim of intentional interference with a prospective business advantage, plaintiff must prove that the defendant intended to financially injure or destroy the plaintiff. *Id.* at 199; *Page County Appliance Center v. Honeywell, Inc.*, 347 N.W.2d 171, 177 (Iowa 1984); *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799 (Iowa 1984). In cases of interference with existing contracts, proof of such purpose is not essential. *Nesler*, 452 N.W.2d at 199; *Farmers Coop. Elevator, Inc., Duncombe v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1975).

Hawkeye's principal argument on appeal is that this case is controlled by *Preferred Marketing Associates Co. v. Hawkeye National Life Insurance Co.*, 452 N.W.2d 389 (Iowa 1990). In that case, the same PMA agents who Hawkeye hired to market its new product sued Hawkeye when the relationship soured and the marketing contract was terminated. We affirmed the district court's refusal to direct a verdict for Hawkeye on PMA's claim that Hawkeye breached its contract to pay renewal commissions following termination. *Id.* at 395. But we found insufficient evidence to affirm a verdict for PMA on its claim that, by terminating its contract, Hawkeye intentionally interfered with PMA's expectation of future commissions flowing from business expected to be generated by soliciting representatives in the PMA hierarchy. *Id.* at 396. We held the contract was terminable at will by either party, and the record contained no evidence of an improper motive on Hawkeye's part except to rid itself of an "uncooperative marketing director." *Id.* Any destruction of PMA's ability to

profit from future Hawkeye policyholders was merely incidental to Hawkeye's legitimate competitive interest following termination of their relatively brief relationship. *Id.*

■ The situation before us is quite different. A rational fact finder could reasonably infer from the evidence that Hawkeye intentionally interfered with a well-established block of business developed by Burke over a fourteen-year period. Further, the interference took place *prior* to Burke's termination as an agent, not following the termination as in *Preferred Marketing.* By soliciting and encouraging Burke's customers to strip the cash values from existing policies in order to replace them with new ones, Hawkeye agents not only interfered with Burke's contractual rights to renewal commissions on the old policies, but demonstrably reduced Burke's chances of writing new business for these customers in the future.

Substantial evidence in the record supports Burke's claim that Hawkeye's distribution of his customer list was improper by industry standards. In the competitive insurance market, the details of a policyholder's existing coverage are guarded closely, since receipt of such information would give a significant selling advantage to the recipient. Thus, while Hawkeye maintains that preservation of business was its sole motive for providing Burke's customer list to its other agents, the record suggests that company officials anticipated rewriting those customers' policies and knew the result would be injury to Burke's business, *i.e.*, vested renewal commissions and other future income.

In addition, Hawkeye had PMA agents call on Burke's customers after his termination, cognizant that his agent's appointment contract provided for the cutoff of his vested renewal commissions if he later were to "induce a policyholder to relinquish a policy." Testimony in the record shows that Burke did all he could to avoid jeopardizing these commissions: he surrendered his list of current customers, refrained from calling on them on behalf of other insurance companies, and returned all company materials.

Substantial evidence in the record supports the trial court's finding that if Hawkeye had not prompted Burke to believe he was secure in his right to vested renewals, Burke could have and would have replaced the Hawkeye business wholesale with competitors' products, to the direct economic disadvantage of Hawkeye. Instead, Hawkeye used the "chilling effect" of Burke's contract to discourage him from competing with PMA agents for business with his old customers, then rewrote his old policies, thereby destroying the vested renewals he had been receiving from them. The timing of the company's letter of termination to Burke—shortly after he learned other agents were contacting his customers and one day after he complained to Raynold Peterson, Hawkeye's agency vice president—also is instructive as to the company's motivation and objectives.

■ We think it significant that the trial court clearly expressed its finding that Burke was "credible, honest, and forthright" at trial, while the testimony of Peterson was "largely self-serving" and "contradicted other evidence." The court also found that Hawkeye representatives were less than candid in company responses to Burke both before and after his termination. Moreover, we do not find the evidence of loss entirely speculative, as Hawkeye suggests, by the fact that only a limited number of policies were actually rewritten by PMA agents before Hawkeye fired Burke. The evidence revealed that Burke's list was thoroughly "worked" in the months preceding Burke's termination, without his knowledge. Expert testimony suggested that ordinarily customers do not replace their policies immediately following solicitation.

■ Burke claimed damages in excess of $400,000. We are persuaded that the court's judgment for a quarter of that amount is reasonably related to losses flowing from Hawkeye's deliberate acts. In summary, we find ample evidence in the record to sustain the court's judgment on a

theory of intentional interference with prospective business advantage.

 V. To allow Burke to recover substantial punitive damages on its late-filed amendment is quite another matter. The amendment substantially changed the issues on the fourth day of trial, four years after the case was filed. *See Bremicker v. TCI Telecommunications Corp.*, 420 N.W.2d 427, 429 (Iowa 1988). Under this record, we are persuaded that the court abused its discretion. We thus reverse the award of punitive damages.

VI. Finally, we agree with Hawkeye that the court's judgment for actual damages, itemized earlier in this opinion, totals $107,400 not $117,400. The case must be remanded for entry of a mathematically correct judgment.

To summarize, we affirm the court's judgment for Burke on his claim of actual damages, as amended, and reverse the judgment for punitive damages.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.