Michael A. COMPIANO, John S. Jaeger and Del Renneke, Appellants,

v.

HAWKEYE BANK & TRUST OF DES MOINES, Hawkeye Bancorporation, Mercantile Bancorporation, Inc., and Merger Sub, Appellees.

No. 97–1215.

Supreme Court of Iowa.

Jan. 21, 1999.

Lawrence L. Marcucci, Michael A. Dee, and Keri Ferrell–Kolb of Shearer, Templer & Pingel, West Des Moines, for appellants.

Roger T. Stetson, Margaret C. Callahan, and Michael R. Reck of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, and Gerald H. Grask, Des Moines, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, SNELL, and TERNUS, JJ.

TERNUS, Justice.

This appeal arises out of the same circumstances as does another appeal we decide today, *Financial Marketing Services, Inc. v. Hawkeye Bank & Trust,* 588 N.W.2d 450 (Iowa 1999). Both cases ensued from the termination of the business relationship between Financial Marketing Services, Inc. (FMS) and appellee, Hawkeye Bank & Trust of Des Moines (Hawkeye). In the present appeal, independent insurance agents licensed through FMS brought suit against Hawkeye, claiming Hawkeye's actions interfered with their existing contracts and their prospective business relations. The district court granted summary judgment to the bank on these claims and the agents appealed. We hold the agents have failed to generate a genuine issue of material fact on whether Hawkeye acted with the predominant purpose to injure or destroy the agents' contractual or prospective business relations. Accordingly, we affirm.

I. *Background Facts and Proceedings.*

A detailed history of the relationship between FMS and Hawkeye is contained in our *Financial Marketing* opinion and will not be unnecessarily repeated here. *See Financial Marketing,* 588 N.W.2d at 453–55. FMS and Hawkeye were parties to two contracts, the 1983 contract and the 1990 contract, under which Hawkeye and affiliated banks agreed to refer bank customers to FMS so FMS could sell life insurance and annuity products to these individuals. FMS and Hawkeye shared the commissions from these sales.

Actual sales to bank customers were made by insurance agents licensed through FMS. Most of these agents were bank employees, but some were independent agents. (Our references in this opinion to "the agents" are to the independent agents.) Plaintiffs, Michael A. Compiano, John S. Jaeger, and Del Renneke, were independent agents for FMS. The contracts between these agents and FMS (hereinafter referred to as "the agent contracts") provided for the payment of commissions to the agents and set out production requirements and termination procedures. The agent contracts stated that upon termination of the contracts, the agents were to surrender all records pertaining to the business of FMS and that all insurance business referred to the agent by FMS was. the permanent and exclusive property of FMS. The

agent contracts also restricted the agent's ability to terminate or replace any business that was provided through FMS or bank leads.

In addition to the agent contracts with FMS, each agent also had a written contract or oral agreement with the individual Hawkeye banks that he serviced. The agents do not contend that their relationships with the individual banks were anything but at-will.

As detailed more fully in our *Financial Marketing* opinion, Hawkeye decided to handle the sale of life insurance and annuities to its customers in-house. In 1995, it terminated its relationship with FMS. After FMS brought suit against Hawkeye, the independent agents intervened.[1] They alleged that actions taken by Hawkeye in connection with its plan to service its customers' life insurance and annuity needs in-house interfered with the agents' relationship with individual Hawkeye banks and with the agents' prospective business relationships with insurance clients.[2] (These claims were later severed from the main case between FMS and Hawkeye.) The agent's claims were eventually dismissed on Hawkeye's motion for summary judgment. It is from this adverse summary judgment ruling that the agents appeal.

## II. *Scope of Review.*

We review the district court's ruling on a summary judgment motion for correction of errors of law. *See Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 916 (Iowa 1997). A summary judgment will be upheld "when the moving party shows no genuine issue of material fact exists and it is entitled to judgment as a matter of law." *C–*

*Thru Container Corp. v. Midland Mfg. Co.*, 533 N.W.2d 542, 544 (Iowa 1995).

## III. *Elements of Intentional Interference Claims.*

Both theories alleged by the agents, intentional interference with contract and intentional interference with prospective business relations, require proof that the defendant intentionally and improperly interfered with the relationship at issue. *See Willey v. Riley*, 541 N.W.2d 521, 526–27 (Iowa 1995); *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 303 (Iowa 1994). The distinction between these torts is that to recover for interference with *prospective* business relations, a plaintiff must prove the defendant acted with the sole or predominant purpose to injure or financially destroy the plaintiff. *See Willey*, 541 N.W.2d at 526–27; *Burke v. Hawkeye Nat'l Life Ins. Co.*, 474 N.W.2d 110, 114 (Iowa 1991).

The existing contracts with which the agents claim Hawkeye interfered are the agents' contracts with the individual banks. As noted earlier, it is undisputed that these contracts were terminable at will. We have previously held that contracts terminable at will are more properly protected as a prospective business advantage rather than as a contract. *See Water Dev. Co. v. Board of Water Works*, 488 N.W.2d 158, 162 (Iowa 1992). Consequently, the higher standard of proof requiring substantial evidence that the defendant's predominant or sole motive was to damage the plaintiff is required. *See id.*

In the present case, therefore, if the record lacks substantial evidence of such a motive, Hawkeye is entitled to summary

1. The agents actually sued three entities in addition to Hawkeye. Defendant, Hawkeye Bancorporation, is a bank holding company that owned Hawkeye and the affiliated Hawkeye banks. Defendants, Mercantile Bancorporation, Inc. and Merger Sub, are companies that participated in a later merger involving Hawkeye Bancorporation. Mercantile Bancorporation and Merger Sub took no active part in the events giving rise to this lawsuit and were named as defendants purely for purposes of any successor liability they might have. See *Financial Marketing*, 588 N.W.2d at 453–54 n. 2.

2. The agents also sought damages as third-party beneficiaries to the 1990 contract between FMS and Hawkeye. At the trial of FMS's claims, the jury found that Hawkeye had not breached this agreement. FMS did not appeal the adverse judgment entered on this verdict and so it is now final. The agents concede that this final judgment precludes any recovery by them as third-party beneficiaries. See 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 10.9, at 51 (2d ed.1998) (stating rights of third-party beneficiary are subject to any defenses of the promisor against the promisee).

judgment on both of the agents' tortious interference claims. We conclude such evidence is lacking.

### IV. *Evidence of Motive to Injure or Destroy Plaintiff's Business.*

The agents complain of several actions by Hawkeye that allegedly interfered with their existing and prospective business relationships. They point to these actions as evidencing Hawkeye's intent to injure or destroy the independent agents' business.

■ One act of interference upon which the agents rely is Hawkeye Bancorporation's formation of Hawkeye Investor Center, Inc. (HICI). HICI was a broker-dealer organized to sell securities, investments, life insurance, and annuities. A review of the documentation of this transaction reveals no indication that Hawkeye acted to injure FMS or its independent agents. Rather, these records show that Hawkeye had legitimate business concerns about the confidentiality of bank customer information, ownership of the customers, and the fairness of the current commission arrangement, prompting it to internalize its life insurance and annuity sales program.

■ The agents also criticize Hawkeye's attempts to compile a list of its life insurance and annuity customers. This conduct, however, is entirely consistent with Hawkeye's decision that it was to its financial advantage and better for its customers that the life insurance and annuity business be handled in-house. Moreover, there is nothing inherently improper about Hawkeye's development of a customer list. *See Ballagh v. Polk–Warren Mut. Ins. Ass'n,* 257 Iowa 1334, 1343, 136 N.W.2d 496, 501 (1965) (holding a party has "the right to use information obtainable from its own files in soliciting business"). Furthermore, the agents introduced no evidence that Hawkeye's actions violated an industry-wide practice. *Cf. Burke,* 474 N.W.2d at 113–14 (holding company's actions in competing for clients was improper where such actions were unacceptable under industry standards). Its actions certainly did not violate any contractual rights of the independent agents who, under their contracts with FMS, had no ownership interest in this book of business. Thus, we conclude Hawkeye's identification of its life insurance and annuity customers does not support a finding that it acted with an improper motive.

■ The agents also assert that Hawkeye, through HICI, directly competed with FMS for sales in violation of the 1990 contract between FMS and Hawkeye. We have already determined, however, that this competition, if it occurred, was not improper and did not violate any contractual obligation of Hawkeye to FMS. *See Financial Marketing,* 588 N.W.2d at 456.

■ The agents place great reliance on other actions that it claimed were in breach of FMS's 1990 contract with Hawkeye: (1) failing to refer leads to the agents, (2) advising bank customers to stop doing business with the agents, (3) prohibiting the agents from meeting with bank customers on bank premises, and (4) having FMS agents who were Hawkeye employees meet with bank customers. These actions are not in violation of the 1990 contract, however, because that contract did not require that sales of life insurance and annuity products be made by FMS's independent agents as opposed to bank employees who were licensed through FMS. In fact, the agreement specifically required that FMS contract with all bank employees who were licensed to sell insurance or wanted to be so licensed. The only provision in the 1990 contract that could be interpreted to address independent agents is FMS's obligation to hire additional sales persons as business and referrals warrant. Thus, there was nothing improper about Hawkeye using its in-house FMS agents to sell life insurance and annuity products. This action does not evidence an intent to improperly interfere with the independent agents' relations with individual Hawkeye banks or with the agents' clients. Rather, Hawkeye's conduct is entirely consistent with its legitimate long-term plan to handle this business internally.

In summary, the evidence shows that Hawkeye made a decision to sell life insurance and annuities without the assistance of outside general or writing agents. There is

not substantial evidence that this decision was motivated by anything other than the bank's desire to improve its own financial condition and improve the service to its clients. *See Berger v. Cas' Feed Store, Inc.,* 543 N.W.2d 597, 599 (Iowa 1996) (stating "a party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests"); *Wilkin Elevator v. Bennett State Bank,* 522 N.W.2d 57, 62 (Iowa 1994) (holding that defendant's exercise of its legal rights to protect its financial interests did not support a finding that the defendant acted with the predominant purpose to injure or destroy the plaintiff); *Hoefer v. Wisconsin Educ. Ass'n Ins. Trust,* 470 N.W.2d 336, 341 (Iowa 1991) (defendant's competition with plaintiff was insufficient to support a finding that the defendant acted with the purpose to injure the plaintiff). Hawkeye's proper efforts to achieve its goal, while having the incidental effect of adversely affecting the independent agents' business, do not evidence a predominant motive to injure or destroy the agents' present or future contractual relations. *Cf. Financial Marketing,* 588 N.W.2d at 459 (holding that substantially similar evidence did not support a finding that Hawkeye's motive was to financially injure or destroy FMS). Therefore, the district court correctly concluded that as a matter of law the agents could not recover on their claims of intentional interference.

**AFFIRMED.**