# IN THE COURT OF APPEALS OF IOWA

No. 13-0725
Filed December 24, 2014

**IRONPLANET, INC.,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**RITCHIE BROS. AUCTIONEERS (AMERICA), INC.**
**and SCHECKEL CONSTRUCTION, INC.,**
        Defendants-Appellants/Cross-Appellees.
_____

Appeal from the Iowa District Court for Jackson County, Gary D. McKenrick, Judge.

Scheckel Construction and Ritchie Bros. appeal from judgment entered on a jury verdict awarding consequential and punitive damages for breach of contract and interference with existing contract respectively. IronPlanet cross-appeals the district court's partial grant of judgment notwithstanding the verdict.

**AFFIRMED AS MODIFIED ON APPEAL AND REMANDED; AFFIRMED ON CROSS-APPEAL.**

Thomas H. Walton and Christian P. Walk of Nyemaster Goode, P.C., Des Moines, for appellant Ritchie Bros. Auctioneers (America), Inc.

Stephen R. Eckley of Belin McCormick, P.C., Des Moines, for appellant Scheckel Construction, Inc.

Jacob D. Bylund of Faegre, Baker, Daniels, L.L.P., Des Moines, and Ll. Rhyddid Watkins of Faegre, Baker, Daniels, L.L.P., Minneapolis, Minnesota, pro hac vice, for appellee IronPlanet, Inc.

Heard by Vogel, P.J., and Vaitheswaran and Potterfield, JJ.

**POTTERFIELD, J.**

Defendants Ritchie Brothers Auctioneers, Inc. ("Ritchie") and Scheckel Construction, Inc. ("Scheckel"[1]) appeal from judgment entered on a jury verdict and award against them. The jury found Scheckel liable for breach of contract relative to an agreement with plaintiff IronPlanet. It found Ritchie liable for tortious interference with the IronPlanet-Scheckel contract. IronPlanet cross-appeals from the district court's partial grant of judgment notwithstanding the verdict (JNOV) reducing compensatory damages.

## I. Factual and Procedural Background

Ritchie and IronPlanet are auction companies competing for sellers to auction their equipment through the companies' respective auction processes. Ritchie conducts auctions both on-site, where bidders may observe and inspect the goods, and online. IronPlanet conducts its auctions exclusively online. Both companies had done business with Scheckel in the past, and both caught wind in early 2011 of Scheckel's potential retirement or partial retirement. The whole of Scheckel's equipment would eventually prove to have over seven million dollars in value at auction.

The two companies began courting Scheckel in order to win the right to conduct his auctions. Scheckel met with two IronPlanet managers on April 4, 2011. IronPlanet's managers were intent on securing Scheckel's agreement to conduct the auctions that evening, but Scheckel was adamant that he needed

---

[1] Throughout this case, the acts of Scheckel Construction, Inc. and Tom Scheckel, its owner, blend. "Scheckel" refers both to the business entity and Tom himself as appropriate.

some kind of protection against a bidder winning an auction at a price below market value. Scheckel suggested he be able to secretly bid on his own equipment if the bidding prices were too low in order to encourage higher bids. This is known as a "buyback." IronPlanet does not permit sellers to bid at their own auctions, so the managers and Scheckel struggled to come to an agreement that would provide Scheckel the protection he felt he needed while still comporting with IronPlanet's internal rules and policies.

After a phone call to IronPlanet's CEO to determine how far IronPlanet would go to win the auctions, the IronPlanet managers convinced Scheckel to sign a form listing agreement with a hand-written additional term: "1% Return to Seller Feature." The exact meaning of this additional term was hotly contested at trial. Some testimony described the term as a covert buyback option, while other testimony described it as simply allowing Scheckel to retain a piece of equipment if it received no bids. Some testimony indicated IronPlanet and Scheckel had different understandings of the term, but other testimony showed Scheckel and the managers left their meeting with a clear understanding between them of the term's operation.

The nature of the listing agreement was also hotly contested. Scheckel staunchly described the agreement he signed that night as preliminary. He says it was only one page and did not include a list of any specific items he was willing to sell through IronPlanet. IronPlanet witnesses, on the other hand, stated the

agreement was two pages and was accompanied by a three-page "Schedule A" that listed all of the equipment to be sold.[2]

Finally, the listing agreement included the descriptor "Feature Auction TBD [i.e., to be determined]." IronPlanet sometimes runs "featured auctions" on its website. In general, IronPlanet advertises these auctions as "unreserved." IronPlanet's unreserved auctions have a minimum starting bid, but the highest bidder will win the right to purchase the equipment without exception.[3] The listing agreement describes the Scheckel auctions as a feature auction but does not make clear whether they are to be "reserved" or "unreserved" or the precise contours of those terms.

After Scheckel signed the listing agreement, IronPlanet went to work preparing for the auctions. Scheckel continued to solicit offers from other auction companies like Ritchie. Ritchie knew about the listing agreement with IronPlanet, but continued to court Scheckel for the auctions.[4] Scheckel ultimately signed a contract with Ritchie, and Ritchie conducted the auctions.

IronPlanet sued Scheckel for breach of contract and Ritchie for tortious interference with an existing contract. The case was submitted to a jury for factfinding. The jury's verdict found both defendants liable for damages. Scheckel was found liable for $338,687, the amount of IronPlanet's profits lost from the expected commissions from the Scheckel equipment auctions. Ritchie

---

[2] All five pages are now in the record, but Scheckel maintains that the second page and Schedule A were not included with the single page he signed on April 4, 2011.

[3] This is in contrast to auctions with a "reserve price," which means an auction with a minimum starting bid and a hidden price point set by the seller. If the final highest bid is below the hidden price point, the seller may exercise an option to not sell the item.

[4] At trial, both Scheckel and Ritchie insisted they believed the listing agreement was a preliminary agreement that was not binding on Scheckel.

was found liable for $1,018,852 for the value of profits lost from the Scheckel auctions and other lost business. Ritchie was further found liable for $1,500,000 in punitive damages for continuing to pursue Scheckel's auctions despite its knowledge of IronPlanet's previous agreement.

On post-trial motions, the district court found the award against Ritchie for $1,018,852 in lost profits to be speculative for any amount above the $338,687 in lost profits for which Scheckel was liable.[5] It partially granted Ritchie's request for JNOV to reduce the award before entering judgment.

Ritchie and Scheckel appeal the jury's awards of damages. IronPlanet cross-appeals the district court's modification of the jury award.

Together the parties raise twenty-one issues on appeal and cross-appeal. We will evaluate the standard and scope of review applicable to each as we discuss the claim.

**II. Evidentiary Issues**

A. Letter from Scheckel's Attorney

Ritchie and Scheckel claim the district court erred by excluding a letter from Scheckel's attorney to IronPlanet from the evidence before the jury. We review for abuse of discretion. *See Heinz v. Heinz*, 653 N.W.2d 334, 338 (Iowa 2002).

Ritchie argues the letter, which was sent to IronPlanet, would support the proposition that Ritchie continued to pursue Scheckel's business because it believed IronPlanet and Scheckel had not entered into a binding agreement.

---

[5] The defendants were held jointly and severally liable for the lost-profits damages.

Scheckel argues the letter demonstrates he and IronPlanet held fundamentally disparate understandings of the effect of the listing agreement. IronPlanet counters that Ritchie and Scheckel were free to question their witnesses about the contents of the letter but elected to refrain from doing so.

The district court did indeed instruct the parties that their communications with counsel about the transactions and alleged agreements in this case could be presented to the jury. The price of offering that evidence was a waiver of the privilege that kept all parties from compelling discovery from the others regarding the legal advice they received from their counsel.

Both Ritchie and Scheckel argue they offered proof that the letter should be admitted for other permissible purposes, which would allow the letter to be admitted without waiving their privileges. However, the district court reasoned "[T]o the extent that if there is some relevance, the danger of unfair prejudice and confusion of the jury outweighs its relevance."

The court's concern was well-founded. Even the parties are confused amongst themselves regarding the precise reason for which the letter might have been admitted, and the danger of the jury using the letter for a purpose that would otherwise have necessitated a waiver of privilege, if realized, would have permitted the offering parties to circumvent the rules of evidence. The court's ruling ensured the parties could not offer evidence without escaping the attendant waiver of privilege.

The district court did not abuse its discretion by excluding the letter, particularly when the parties could have elected to put the substance of the letter before the jury through the questioning of their witnesses.

B. IronPlanet's Web Site

Ritchie and Scheckel also claim the district court should have admitted a print-out from IronPlanet's website that the court excluded. Again, we review for abuse of discretion. *See Id.* at 338.

The court rightly noted there was no foundation for relevance as to time, since the document was printed off from the web site during litigation rather than from the relevant period: when the Scheckel auctions were advertised. The court also held the print-out was cumulative of other evidence already before the jury, and we agree with that conclusion.[6] The district court did not abuse its discretion in excluding the print-out, and due to its cumulative nature, Ritchie and Scheckel were not prejudiced by the exclusion.

**III. Deficiencies of the Record**

Ritchie and Scheckel claim the district court erred when it failed to correct an omission in the transcript. We review evidentiary issues for abuse of discretion. *See Kurth v. Iowa Dep't. of Transp.*, 628 N.W.2d 1, 5 (Iowa 2001); *see also Neas v. Osaro*, No. 10-1364, 2011 WL 5395076, at *5 (Iowa Ct. App. Nov. 9, 2011) (applying the standard to correction of omissions). The trial transcript does not include the testimony presented to the jury in video recordings of depositions. The district court declined to correct the transcript because it was "unable to determine from its review of the transcript or the information submitted

---

[6] Ritchie noted that "ample evidence" already demonstrated the facts it was attempting to prove with the print-out, and it stated its desired conclusion was compelled by "other evidence" even in the absence of the print-out. This does not, however, necessitate a finding that IronPlanet's planned or actual auctions of Scheckel's goods were conclusively "unreserved" in the statutory sense as Ritchie claims. We further discuss the relationship between IronPlanet's "Featured Auctions" and the reserved/unreserved nature of the IronPlanet-Scheckel auctions in section V(A)(4) below.

[by the parties] what specifically was played for the witnesses or the jury at the time of trial as reflected in the transcript."

Ritchie claims in its brief that its affidavit supporting its request for correction is "uncontroverted" by IronPlanet. Nevertheless, the district court did not feel sufficiently confident in Ritchie's submission to rely on its description alone. The court was not required to augment the transcript,[7] and Ritchie's multiple missteps with the video depositions[8] gave rise to the district court's skepticism as to precisely what should be included in a potential correction. The district court did not abuse its discretion in failing to correct the trial transcript.

Furthermore, there is no evidence any prejudice resulted from this omission, as there was ample evidence in the record regarding "the meaning of the buyback provision" that is in line with the deposition recording. The district court's decision not to correct the transcript does not require reversal.

## IV. Necessary Findings of Fact

Ritchie argues the district court improperly refused its request for specific findings of fact. Ritchie asserts the findings of fact were critical to its defense and a finding of fact from the jury, or alternatively from the district court itself, was required.

---

[7] "If anything material to either party is omitted from the record by error or accident or is misstated therein, . . . the district court . . . *may* direct that the omission or misstatement be corrected." Iowa R. Civ. P. 6.807 (emphasis added).

[8] We agree with Ritchie that IronPlanet's recounting of Ritchie's errors do not bear directly on the issue of correcting an omission in the transcript. We note, however, that those same errors reasonably gave the district court some consternation as to accepting Ritchie's description of the portions of the recordings seen by the jury.

A. Special Interrogatory[9]

Ritchie and Scheckel assert the district court erred by refusing to submit a special interrogatory to the jury for a finding of fact as to the precise meaning of the "1% Return to Seller Feature" handwritten on the listing agreement. The explicit finding of fact on the record, they argue, would afford them judgment as a matter of law. We review submission of special interrogatories for abuse of discretion. *See Pexa v. Auto Owners Ins. Co.*, 686 N.W.2d 150, 161 (Iowa 2004); *Netteland v. Farm Bureau Life Ins. Co.*, 510 N.W.2d 162, 168 (Iowa Ct. App. 1993).

The district court denied the motion to include the special interrogatory on the verdict form because the verdict form as it existed "adequately addresse[d] the questions necessary." The court explained that even without the special interrogatory, the verdict form would reveal if the jury believed a contract was made, a finding which would permit the court to make the necessary legal determinations in post-trial motions. Further, we agree that the jury's verdict relative to its instruction on Scheckel's fraudulent inducement defense[10] establishes a factual determination regarding the "1% Return to Seller Feature."

---

[9] IronPlanet argues this claim has not been preserved. We disagree. The proposed special verdict squarely presented the trial court with the issue now raised, the jury instructions as submitted were sufficient to guide the jury if it had returned the special verdict in Ritchie's favor, and the district court ruled on the merits of the motion notwithstanding its timeliness. The issue of the special verdict has been preserved for our review. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012).

[10] Jury instruction 11 stated one element of Scheckel's defense required him to establish "IronPlanet represented to Scheckel Construction that [] Scheckel Construction would be able to buy back equipment for which the auction sale price was insufficient." Based on the evidence presented at trial, this element was the primary factual question put to the jury based on the fraudulent inducement defense.

The district court denied the motion to submit the special interrogatory to the jury because it would have been redundant and a finding on the meaning of the contract term was unnecessary for the court to come to its own legal conclusions in post-trial motions. It did not abuse its discretion by doing so.

B. Judicial Findings of Fact[11]

Ritchie and Scheckel argue that the failure of the district court to submit the special interrogatory created a duty for it to issue its own findings of fact into the record as to the meaning of the "1% Return to Seller Feature." They further argue the district court was required to issue findings of fact as to the reserved or unreserved nature of IronPlanet's featured auctions. Insofar as these issues were raised and denied in the parties' post-trial motions, we review for errors at law. *See Lovick v. Wil-Rich*, 588 N.W.2d 688, 692 (Iowa 1999).

In ruling on the parties' post-trial motions, the district court noted that it "made appropriate findings in conjunction with its previous order, and no further expansion of those findings is necessary." We agree that the jury's findings of fact and the court's findings of fact are sufficient to answer the legal questions posed by Ritchie and Scheckel.

The jury's findings of fact were sufficient for the court to rule on the illegality and public policy defenses Ritchie asserted.[12] Additionally, a separate finding of fact regarding "how IronPlanet promotes its Featured Auctions" as a

---

[11] This issue, like the issue of the special interrogatory, was preserved by the district court's ruling on the merits of the post-trial motion raising it notwithstanding IronPlanet's claim to the contrary. *See Lamasters*, 821 N.W.2d at 864.

[12] Ritchie acquiesced to the court's ability to rule based on preexisting findings of fact when it did not request additional findings of fact regarding the meaning of the "1% Return to Seller Feature" in its post-trial motions, but asked instead for expanded conclusions of law.

*general* matter would not have enabled the district court to rule as a matter of law on the nature of the *specific* individual auctions IronPlanet ran to sell Scheckel's goods. The district court did not err by relying on the jury's established findings of fact to rule on the legal questions presented by Ritchie and Scheckel.

### V. Motions for Judgment as a Matter of Law

Ritchie and Scheckel together raise thirteen grounds upon which they claim the district court erred in denying their motions for judgment as a matter of law, which took the form of motions for directed verdict at the close of IronPlanet's case in chief and post-trial motions for JNOV. We review the district court's denial of the motions for errors at law.[13] *See Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009); *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 345 (Iowa 1999).

The district court properly denied the motions if "there was sufficient evidence to justify submitting the case to the jury when viewing the evidence in the light most favorable to the nonmoving party." *Van Sickle Constr. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010). The evidence is sufficient to submit the case to the jury if each element of the claim is supported by substantial evidence, which is evidence that "a reasonable mind would find [] adequate to support a finding." *Id.* We include all reasonable inferences in determining whether evidence is substantial. *Id.*

---

[13] The parties failed to appeal the denial of their motion for a new trial, which would have permitted us to review for an abuse of discretion. *See Lehigh Clay Prods, Ltd. v. Iowa Dep't of Transp.*, 512 N.W.2d 541, 544 (Iowa 1994).

A. Enforceable Contract

The most basic question of IronPlanet's claims against Ritchie for interference with its contract and against Scheckel for breach of that same contract is whether such a contract actually existed and was enforceable. Ritchie and Scheckel together raise eight grounds upon which they assert a lack of substantial evidence to support the jury's conclusion that Scheckel and IronPlanet had in fact entered into an agreement. If no enforceable agreement existed, IronPlanet's claims all fail.[14]

*1. Mutual Assent.* Scheckel argues there was no mutual assent between the parties—i.e. a meeting of the minds—as to the meaning of the handwritten "1% Return to Seller Feature" included in the listing agreement he signed. "For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

The record shows and all parties cite to testimony that could support either conclusion: that Scheckel and IronPlanet understood the meaning of the term, illicit or otherwise; or that everyone involved had altogether disparate understandings of the term. Though testimony of IronPlanet employees that Scheckel could not have misunderstood the term is not dispositive of Scheckel's actual understanding, such testimony is evidence that could reasonably support

---

[14] As described in the relevant jury instruction, the first element of the breach of contract claim against Scheckel is "[t]he existence of a contract," and the first element of the interference claim against Ritchie is that "IronPlanet had a contract with Scheckel Construction." Since both claims rely on the one agreement between Scheckel and IronPlanet, both claims fail if the contract is not proven.

a finding that there was a meeting of the minds, particularly if the jury discredited Scheckel's contrary testimony. The court's denial of the motions recognized that "the jury may believe all, part, or none of any witness's testimony."

Though there is evidence there was no meeting of the minds, there is likewise substantial evidence there *was* a meeting of the minds between Scheckel and IronPlanet. Therefore the district court did not err in submitting the question to the jury or denying the parties' JNOV motions.

*2. Indefinite Essential Terms.* Scheckel next argues the essential terms of the alleged contract between himself and IronPlanet were not sufficiently definite.[15] "[I]f an offer is indefinite there is no intent to be bound." *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 286 (Iowa 1995).

Scheckel argues that there are at least two terms that are not sufficiently definite, rendering the supposed agreement unenforceable. First, he notes there is no auction date included in the listing agreement. He concedes, however, this omission "alone" is not fatal. He strenuously points to the "1% Return to Seller Feature" term, claiming it is "too truncated and vague to ascertain its meaning."

"[V]agueness, indefiniteness, or uncertainty are, however, matters of degree, and therefore each case must be decided on its own particular circumstances." *Gildea v. Kapenis*, 402 N.W.2d 457, 459 (Iowa Ct. App. 1987).

---

[15] IronPlanet argues this claim is not preserved on appeal. It is undisputed that neither Scheckel nor Ritchie raised this issue in their post-trial motions, which deprived the district court of the "opportunity to correct any error in failing to direct a verdict." *Rife v. D.T. Corner, Inc.*, 641 N.W.2d 761, 767 (Iowa 2002). However, the district court ruled on the merits of the claim on the parties' motions for a directed verdict. *See Lamasters*, 821 N.W.2d at 864. IronPlanet's citation to *Rife* is not dispositive because the appellant in that case also failed to state how the issue was preserved contrary to Iowa Rule of Appellate Procedure 6.903(2)(g)(1).

We acknowledge that the short phrase "1% Return to Seller Fee" is not exceedingly clear, but it expresses a condition on performance that may be construed from circumstances of the case. There was sufficient evidence to submit the existence of the contract to the jury.

The ambiguity inherent in the handwritten language on the pre-printed listing agreement is not so severe as to render the contract unenforceable as a matter of law. The district court did not err in refusing to render judgment as a matter of law on this issue.

*3. Lack of Mutuality; Illusory Promise.* Scheckel next alleges the listing agreement was in fact illusory, rendering the contract unenforceable. He argues IronPlanet's terms and conditions were incorporated into the listing agreement and those terms and conditions grant IronPlanet the unilateral and unrestricted power to terminate the agreement. "[R]eservation of an absolute right to terminate an executory agreement negates a contract, because the agreement cannot be enforced and it therefore lacks mutuality." *Midwest Mgmt. Corp. v. Stephens*, 291 N.W.2d 896, 913 (Iowa 1980).

IronPlanet, however, argues even if the agreement could have been considered illusory, it was rendered enforceable by the partial performance of IronPlanet's obligations (i.e. inspection of equipment, advertising the auctions, listing the equipment, accepting initial bids).[16] Scheckel counters that

---

[16] *See* 17A Am. Jur. 2d Contracts § 130 ("[T]he illusory nature of alternative promises disappears if the contract is executed and the alternative actually performed is not illusory.").

IronPlanet's actions were not actually the partial performance of its theoretical contractual obligation under the listing agreement.

The parties' arguments regarding this issue illustrate why the district court properly put the question before the jury. There is evidence from which a jury could conclude whether IronPlanet's promise to perform was illusory and whether IronPlanet's subsequent acts were partial performance that cures the illusory agreement or merely preparation to perform as Scheckel asserts. Jury instruction 9[17] instructed the jury on the legal matters and properly left the necessary determinations to the finder of fact. The district court did not err in declining to rule as a matter of law on the mutuality of the contract.

*4. Illegal Agreement: Iowa Code Section 554.2328(3) (2013).* Ritchie argues the IronPlanet-Scheckel agreement was illegal on three grounds, the first of which is that the agreement is contrary to Iowa Code section 554.2328(3).[18] Under Ritchie's theory, the agreement was unenforceable because it contemplated the use of a mechanism (the "1% Return to Seller Feature") that allowed the seller to withdraw the item, which is only permitted in reserved auctions. Ritchie asserts the auction was announced as unreserved.

---

[17] Jury instruction 9 states, "[I]f an agreement gives one party the power to terminate the agreement at any time at will, without more, the promise is illusory. If, however, performance under the contract is undertaken and that performance is detrimental or beneficial, the contract, which itself originally was illusory, will become enforceable."

[18] An auction "is with reserve unless the goods are in explicit terms put up without reserve." Iowa Code § 554.2328(3). Ritchie further relies on a comment to the statute: "The prior announcement of the nature of the auction either as with reserve or without reserve will, however, enter as an 'explicit term' in the 'putting up' of the goods and conduct thereafter must be governed accordingly." *Id.*, cmt. 2. According to Ritchie, the statute and its comment "make[] it illegal for an announced unreserved auction to be conducted as a reserved auction."

The record shows that IronPlanet's weekly "featured" auctions were described as "unreserved."[19]  However, the record does not demonstrate or even insinuate that the planned IronPlanet-Scheckel auctions were specifically advertised as unreserved.[20]  In fact, the record demonstrates the opposite: despite their "featured auction" status, IronPlanet held out the Scheckel auctions as reserved.

The district court therefore held it could not determine as a matter of law that the IronPlanet-Scheckel auctions were intended to be reserved or unreserved.  It properly put the issue to the jury.  There was sufficient evidence in the record for a reasonable jury to find that the IronPlanet-Scheckel auctions were intended to be and ultimately were reserved auctions in spite of their "featured auction" status.[21]  There was also sufficient evidence for the jury to conclude the usual unreserved label of other featured auctions would have applied to the Scheckel auctions.  The district court did not err in putting the question to jury and declining to rule on the issue as a matter of law.

---

[19] IronPlanet espouses a differentiation between "unreserved" as a legal term of art and "unreserved" as auction customers have come to understand it.  As a term of art, it denotes an auction with no restrictions as to minimum opening bid, bid amount, or a minimum final selling price.  As the term is understood by consumers, it denotes only that there is no minimum final selling price.  Though the asserted definition as it relates to consumers is borne out by testimony at trial, the asserted distinguishable definition as a legal term of art is not sufficiently clear in our jurisprudence for us to rely on this argument to decide the issue.

[20] Even if every contested piece of evidence had been admitted before the jury, there appears to have been none that would have shown IronPlanet putting forward the Scheckel auctions as unreserved.

[21] Throughout the proceedings, Ritchie's arguments have presumed that IronPlanet's past advertisements regarding its unreserved featured auctions preclude it from ever holding a reserved featured auction.  A "featured auction" is not a legal term of art, and IronPlanet is free to describe or not describe any auction of any characteristic as a "featured" auction.

*5. Illegal Agreement: Iowa Code Section 554.2328(4).* Ritchie next claims the agreement was also in violation of Iowa Code section 554.2328(4). Because it failed to assert this issue in its motion for a directed verdict or post-trial motions, it waived this issue on appeal. *See Lamasters*, 821 N.W.2d at 864.

*6. Illegal Agreement: Iowa Consumer Fraud Act.* Ritchie alleges the agreement is unenforceable because it violates the Iowa Consumer Fraud Act, found at Iowa Code section 714.16.[22] Ritchie's allegation is predicated upon its conclusion that IronPlanet announced the IronPlanet-Scheckel auctions as unreserved. That conclusion is not supported by the findings of fact nor can it be established as a matter of law because there is substantial evidence in the record to support the conclusion that IronPlanet did not advertise the Scheckel auctions as unreserved. Therefore, section 714.16 cannot be said to prohibit the IronPlanet-Scheckel agreement as a matter of law. The district court did not err in denying Ritchie's motions to enter judgment in its favor as a matter of law on the back of our consumer fraud protections.

*7. Public Policy.* Ritchie asserts it was entitled to judgment as a matter of law because the alleged agreement between Scheckel and IronPlanet was contrary to public policy. We will not enforce contracts that are "injurious to the public or contrary to the public good." *Thomas v. Progressive Cas. Ins. Co.*, 749

---

[22] Iowa Code section 714.16(2)(a) provides:

> The act, use or employment by a person of an unfair practice, deception, fraud, false pretense, false promise, or misrepresentation, or the concealment, suppression, or omission of a material fact with intent that others rely upon the concealment, suppression, or omission, in connection with the lease, sale, or advertisement of any merchandise . . . , whether or not a person has in fact been misled, deceived, or damaged, is an unlawful practice.

N.W.2d 678, 687 (Iowa 2008) (citations omitted). However, "[t]he power to invalidate a contract on public policy grounds must be used cautiously and exercised only in cases free from doubt." *Id.* (citations omitted).

We cannot say this case is free from doubt in regards to the public policy implications of the alleged contract between IronPlanet and Scheckel. Ritchie's public policy argument again relies on its conclusion either that the "1% Return to Seller Feature" was indisputably a buyback option or that the Scheckel auctions were indisputably put forward as unreserved auctions. There is substantial evidence in the record that could lead a jury to contrary conclusions, and the district court was therefore in the right to refuse to render judgment as a matter of law on public policy grounds.

*8. Invalid Critical Term.*[23] Ritchie next argues it was entitled to judgment as a matter of law because IronPlanet's agreement with Scheckel included a pivotal invalid term (i.e. the "1% Return to Seller Feature"), invalidating the agreement in its entirety. "[I]f the contract would not have been entered into independent of the invalid portion, the entire contract is void." *Miller v. Marshall Cnty.*, 641 N.W.2d 742, 752 (Iowa 2002).

Though the record shows the term in question was required by Scheckel as a condition for signing the listing agreement, the record does not irrefutably show that the term was invalid. There is sufficient evidence in the record for a reasonable jury to conclude the term was valid and properly included in the

---

[23] IronPlanet claims Ritchie did not raise this issue before the district court, waiving the issue on appeal. We agree with Ritchie that the language of its motions before the district court put the issue before the court, which rendered a decision on the merits of the claim. It is therefore preserved. *See Lamasters*, 821 N.W.2d at 864.

agreement. The district court did not err in denying the motions for judgment as a matter of law on this basis.

In sum, none of the district court's rulings on the eight bases upon which Ritchie and Scheckel assert the district court should have entered judgment in their favor as a matter of law due to the absence of an enforceable agreement demonstrate any error from the district court. The disparate testimony of the multiple witnesses at trial could have allowed a jury to come to any number of reasonable conclusions about the nature of the alleged contract, the "1% Return to Seller Feature," the parties' intentions or subjective understandings, and how the IronPlanet-Scheckel auctions were to be held out to the public following the signing of the listing agreement. The district court did not err in submitting the issues to the jury.

Because "the jury may believe all, part, or none of any witness's testimony," no party was entitled to judgment as a matter of law, and the district court properly left to the jury the necessary determinations of fact as to the existence of an enforceable agreement.

B. Scheckel's Breach of Contract

Scheckel cannot show he is entitled to judgment as a matter of law regarding the formation of an enforceable contract. However, he goes on to assert the district court erred in failing to enter judgment as a matter of law on two other bases.

*1. Adequate Assurances of Performance.* Scheckel asserts he had reasonable grounds to believe IronPlanet was unable to perform its obligations under the listing agreement, IronPlanet failed to sufficiently assure him of its

ability to do so, and he was therefore justified in treating the agreement as repudiated. "[A] party to a contract who has reasonable grounds to believe that the other party will be unwilling or unable to perform his contractual obligations may require the party to provide adequate assurances of performance." *Top of Iowa Co-op. v. Sime Farms, Inc.*, 608 N.W.2d 454, 466 (Iowa 2000) (citing Iowa Code § 554.2609). "[T]here must be an objective factual basis for the insecurity." *Id.* Whether an objective factual basis exists is a question of fact.

The record in this case shows there is sufficient evidence there was no reasonable grounds for Scheckel's claimed insecurity. While it is true Scheckel asked IronPlanet for a bond, he did not do so until his agreement with Ritchie was imminent. IronPlanet also argues it provided adequate assurance of performance notwithstanding the absence of a bond when it provided Scheckel with a statement of its available assets in its bank account. Because facts necessary to the determination were in dispute and the jury could reasonably have concluded the facts supported either party, the district court did not err in putting the issue before the jury instead of ruling upon it as a matter of law.

*2. Terminable At-Will.* Scheckel claims the listing agreement was terminable at-will, though the proposed effect of so concluding appears inconsistent across its appeal and reply brief. In its initial appeal brief, it argues it was free to terminate the agreement "at will without consequence," insinuating the agreement had been terminated prior to any alleged breach. In its reply brief, responding to IronPlanet's assertion that error has not been preserved, Scheckel argues the effect of a conclusion that the agreement was terminable at-will is instead that the agreement was entirely unenforceable as a matter of law.

We agree with IronPlanet that Scheckel did not claim it unilaterally terminated the agreement prior to breach before the district court, and that claim is not preserved. *See Lamasters*, 821 N.W.2d at 864. Further, Scheckel's characterization of the issue espoused in its reply brief—i.e. the at-will nature of the agreement rendered it unenforceable—is not supported by any citations to authority for that proposition. "Failure to cite authority in support of an issue may be deemed a waiver of that issue." Iowa R. App. P. 6.903(2)(g)(3). This issue is either not preserved or waived, and we will not pass upon its merits.

C. Ritchie's Interference

Ritchie likewise cannot show it is entitled to judgment as a matter of law regarding the formation of an enforceable contract. It raises three other bases upon which it asserts it was entitled to judgment as a matter of law. For IronPlanet to recover from Ritchie for interference with its contract, it must prove—in addition to a valid agreement between Scheckel and IronPlanet—that Ritchie "knew of the contract" and "intentionally and improperly interfered with the contract." *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008).

*1. No Knowledge of Enforceable Contract.* Ritchie claims it had no knowledge Scheckel had entered into a binding and enforceable contract with IronPlanet. "It is not necessary that [Ritchie] had actual knowledge of the specific contract. It is sufficient that [Ritchie] had knowledge of facts, which, if followed by reasonable inquiry, would have led to the disclosure of the contractual relationship." *Revere Transducers, Inc. v. Deere & Co.*, 595 N.W.2d 751, 764 (Iowa 1999) (citations omitted).

Ritchie had actual knowledge or knowledge of facts which would have led it to learn of the existence of a valid contract. Scheckel himself testified that he told Ritchie's local sales representative he "had signed an offer with [IronPlanet]."

As with all of the issues raised in the motions for judgment as a matter of law, there is certainly contrary evidence. For example, Scheckel also repeatedly told Ritchie that he didn't consider the offer to be binding. However, the existence of contrary evidence does not negate the existence of substantial evidence that could lead a jury to conclude Ritchie did in fact have knowledge of an enforceable agreement. The district court did not err when it denied Ritchie's motions for judgment as a matter of law on this issue.

*2. No Improper Act.* Ritchie next contends its actions in pursuing Scheckel's auctions were not improper. The law requires the balancing of many factors to determine whether an actor's behavior is improper, including the nature of the conduct and the motive behind it. *Fin. Mktg. Servs., Inc. v. Hawkeye Bank & Trust*, 588 N.W.2d 450, 458 (Iowa 1999).[24] We also consider business customs and practices, and our ultimate determination is whether Ritchie's conduct was "fair and reasonable under the circumstances." *Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 853 (Iowa 1990).

Based on the evidence in the record, the jury could have concluded Ritchie's acts were improper. Ritchie's offer to pay half of Scheckel's legal fees if

---

[24] The other factors are "the interests . . . with which the actor's conduct interferes, [] the interests sought to be advanced . . . , [] the social interests in protecting the freedom of action of the actor and contractual interests of the other, [] the proximity or remoteness of the actor's conduct to the interference, and [] the relations between the parties." *Fin. Mktg. Servs.*, 588 N.W.2d at 458.

he were sued by IronPlanet indicates a consciousness that obtaining Scheckel's equipment auction would result in litigation.[25] The testimony of other competitors in the industry that they stopped soliciting Scheckel's business after learning about the listing agreement constitutes substantial evidence upon which a jury could determine Ritchie's continued pursuit of the auctions was not fair and reasonable under the circumstances. The district court did not err by declining to rule on this issue as a matter of law.

*3. Competitor's Privilege.* Ritchie's next assertion is that it enjoys the protection of the so-called "competitor's privilege," which would require IronPlanet to prove by "substantial evidence that [Ritchie's] predominant or sole motive was to damage the plaintiff."[26] *Compiano v. Hawkeye Bank & Trust*, 588 N.W.2d 462, 464 (Iowa 1999).

However, this claim is predicated on the bald assertion that "[t]he agreement between IronPlanet and Scheckel was either terminable at will by its terms, or unenforceable for lack of mutuality of obligation." As we have already determined, it was not a foregone factual conclusion or a proper determination of

---

[25] In its reply brief and at oral argument, Ritchie cited to *Edward Vantine Studios, Inc. v. Fraternal Composite Serv., Inc.*, 373 N.W.2d 512, 514 (Iowa Ct. App. 1985), for the proposition that "inducing breach of existing contract by offering 'better price, better service, or better quality' is not 'improper.'" Ritchie's characterization of this case is incomplete at best. While it is true that inducing a breach of contract through normal competition *alone* is not necessarily improper, the interfering party in *Vantine* was held to have acted improperly because it indemnified the breaching party from future legal fees. *Id.* Ritchie and Scheckel included a functionally identical provision in their agreement. It is of no legal consequence that Scheckel requested the clause instead of Ritchie. The mere existence of the clause may be interpreted by a finder of fact as evidence of an improper act. *Vantine* is decidedly contrary to Ritchie's position and claim.

[26] This heightened burden is in effect for interference with contracts that are terminable at will or other prospective business advantages. *Compiano*, 588 N.W.2d at 464.

law that the agreement in question was in fact terminable at-will or unenforceable for lack of mutuality.

Neither Ritchie nor Scheckel was entitled to such a determination as a matter of law, and the jury's findings are contrary to that bare assertion. This issue therefore does not call for substantive analysis. Ritchie cannot demonstrate that the competitor's privilege should apply, so the district court did not err by failing to grant judgment as a matter of law on such a basis.

D. Punitive Damages

In Ritchie's motions for judgment as a matter of law, it asked the district court to hold there was not substantial evidence to support punitive damages and to therefore refrain from submitting the matter to the jury. The submission of the issue to the jury was error, it argues, and the punitive damage award should be vacated.

Punitive damages are proper only where, "by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1. "Willful and wanton disregard" in this context means "an [intentional] act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences." *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (citation omitted).

Our case law makes clear that either actual or legal malice must be shown for the statutory requirements to be satisfied. *Id.* Actual malice is shown "by

such factors as spite, hatred, or ill will," and legal malice is shown by "wrongful conduct committed or continued with a willful or reckless disregard for another's rights." *Id.* "[A]n award of punitive damages is inappropriate when room exists for reasonable disagreement over the relative risks and utilities of the conduct." *Hillrichs v. Avco Corp.*, 514 N.W.2d 94, 100 (Iowa 1994).

Ritchie argues there is no evidence whatsoever of willful and wanton disregard for IronPlanet's rights. We disagree. The record would permit a reasonable jury to conclude that either actual or legal malice towards IronPlanet was accompanied by the disregard of an obvious risk by interfering with an existing contract. IronPlanet presented a plethora of evidence showing Ritchie's competitive spirit towards IronPlanet was extremely fierce and specifically targeted.

Ritchie targeted IronPlanet customers specifically and would engage in commercial transactions that resulted in fiscal loss to itself to undercut IronPlanet's market growth. At least one of Ritchie's employees was evaluated on his job performance by measuring how much he was able to restrict IronPlanet's—but not other competitors'—growth. The record shows that in its pursuit of Scheckel's business, Ritchie acted with a consciousness of the IronPlanet-Scheckel listing agreement, which could reasonably be interpreted as a reckless disregard for its enforceability.

Ritchie characterizes its actions as merely healthy competition in a fiercely competitive industry. There is evidence in the record to support Ritchie's characterization. However, the existence of this contrary evidence makes it more—not less—likely that a jury question has been generated. As Ritchie

points out, statements by the district court could be interpreted to mean that the court itself does not agree with the jury's findings. Yet the questions of whether Ritchie's actions can be considered to be in willful and wanton disregard to IronPlanet's rights under the listing agreement and the relative risks and utilities of Ritchie's conduct were rightfully put before the jury. Because there is substantial evidence in the record to lead the jury to its conclusion Ritchie acted with malice, the district court did not err in submitting the issue of punitive damages.

### E. Judgment as a Matter of Law—Conclusion

Together, Ritchie and Scheckel have raised fourteen bases upon which each party respectively believes it was entitled to judgment as a matter of law. There is certainly evidence to support many of the claims here put forward by Ritchie and Scheckel. However, in no way does the existence of that evidence preclude the fact that there is also substantial evidence to support IronPlanet's position on these issues.

Ritchie and Scheckel point out with relish that the district court itself noted:

> Had this case been tried to the Court, the Court would have reached the factual conclusion that the evidence did not establish the existence of an enforceable contract between IronPlanet and Scheckel on the basis that the "return to seller" provision of the agreement, given its ambiguity and, therefore, construing the provision most favorably to Scheckel, made the agreement illusory; or alternatively that there was no "meeting of the minds" on the meaning of that provision of the agreement, which IronPlanet's representatives acknowledged was material to Scheckel's acceptance of IronPlanet's proposal.

However, the hypothetical results of the trial if the district court—or even this court—had been the factfinder are not relevant. As the district court explained,

"[T]he issue is not what this Court would have found were it the trier of fact; rather, the issue is whether the jury's contrary factual conclusion is supported by substantial evidence." This observation is true for all of the issues raised in the parties' motions requesting judgment as a matter of law. We agree with the district court that the jury's conclusions do enjoy the benefit of substantial evidence in the record in spite of contrary evidence also in the record. The district court did not err is so holding.

**VI. Jury Instruction 16**

Ritchie requests a new trial on the basis of the district court's instruction to the jury. We review an allegation of error in jury instructions for errors at law. *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009). We must consider the instructions in their entirety. *Id.* We will reverse only if the instructions have misled the jury or otherwise resulted in prejudice to Ritchie. *Id.* Prejudice is presumed if the district court materially misstates the law. *Id.*

Jury instruction 16 included the following language:

> You may, but are not required to, find the actions of Ritchie Brothers improper if you find they were motivated, in whole or in part, by a desire to interfere with IronPlanet's contract with Scheckel Construction. You also may, but are not required to, find the actions of Ritchie Brothers improper if Ritchie Brothers was the direct and immediate beneficiary of Scheckel Construction's breach of a contract with IronPlanet.

Ritchie objects to both statements. The first statement, it argues, places an undue emphasis on one factor of a multi-factor test. The second, it argues, suggests to the jury that it may find Ritchie's behavior improper based "alone" on the fact that Ritchie obtained a benefit from Scheckel breaching its contract with IronPlanet.

However, within the context of instruction 16 as a whole, we find that neither of these statements created a risk of prejudice from the jury. The instruction tells the jury that it is to determine whether Ritchie's conduct was "fair and reasonable under the circumstances." The remainder of the instruction, including the language to which Ritchie objects, gives guidance and context for the determination of whether Ritchie's actions were fair and reasonable.

The statements in isolation do appear to allow the jury to find Ritchie's actions improper based solely on the factors discussed (i.e. motive or benefit). However, we are not persuaded that any alleged error could have caused prejudice. Because the statements, read in the proper context, do not stand in isolation, there was no risk of the jury applying them outside the context of an evaluation of what is fair and reasonable. Additionally, instruction 17 adds further context to the statements, instructing the jury that "[c]ompetition is not improper simply because its purpose and effect is to take business from competitors."

The inclusion of the two statements to which Ritchie objects was not prejudicial or otherwise harmful to Ritchie. Ritchie is therefore not entitled to a new trial on that basis.

### VII. Partial JNOV

On its single issue on cross-appeal, IronPlanet argues that the district court's partial grant of Ritchie's JNOV motion is improper. We review a district court's ruling on such motions for errors at law. *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 761 (Iowa 2009).

IronPlanet's claim is based partially on its unilateral declaration that the district court's post-trial order was actually a conditional grant of a new trial. *See*

Iowa Rs. Civ. P. 1.1004, 1.1010. We find IronPlanet's contention without merit. In the district court's April 8, 2013 order and judgment, it found "the evidence in regard to IronPlanet's claim for generalized lost profits was entirely speculative." It therefore concluded the consequential damages award should be remitted[27] to reflect the same measure of consequential damages awarded against Scheckel.

In its May 20, 2013 order, the district court clarified: it "should have directed a verdict in favor of Ritchie Brothers as to [IronPlanet's] claim for any damages in excess of the lost profit directly attributable to the Scheckel breach of contract." Because it failed to direct the verdict, it granted Ritchie's JNOV motion as to that portion of the award. *See* Iowa R. Civ. P. 1.1003(2).

IronPlanet accepted the reduction in compensatory damages post-trial in a document captioned "acceptance of remittitur". IronPlanet's uninvited written consent to remittitur does not unilaterally alter the character of the district court's order. Nor will the partial grant of JNOV "overturn over 100 years of Iowa case law," as IronPlanet argues.[28] While the "acceptance of remittitur" was therefore of no legal effect, it demonstrated IronPlanet's voluntary acceptance of a lower compensatory damage award.

The evidence presented by IronPlanet for the proposition that Ritchie's interference with the contract caused more consequential damages than

---

[27] The district court's use of the word "remitted" in its order serves as IronPlanet's tenuous basis for its claim the district court's partial grant of JNOV is a remittitur and conditional grant of a motion for a new trial. However, the district court—as we do here—used the word in its plain-language sense.

[28] The cases to which IronPlanet cites to demonstrate "100 years of Iowa case law" supporting its position have no bearing on JNOV. The cases consider the conditional grant of a new trial, which is not an issue implicated in the district court's reduction of compensatory damages.

Scheckel's breach of the contract is speculative.[29]  Testimony describing the Scheckel contract as "a big deal," the liquidated damages provision of a contract extrinsic to the one at issue, and testimony describing the ebb and flow of the company's profitability are too speculative to serve as a basis for such calculations.  *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 641 (Iowa 1996) (requiring "a reasonable basis in the evidence from which the fact finder can infer or approximate the damages").

A company like IronPlanet may experience years of economic growth and years of contraction, but there is no evidence that its dip in market performance was directly attributable to the loss of the Scheckel contract in whole or in part.

The district court did not err in partially granting judgment notwithstanding the verdict in Ritchie's favor to reduce the amount of compensatory damages awarded.

### VIII. Amount of Punitive Damages

There is one final issue we must consider.  Though we affirm the district court insofar as it submitted the issue of punitive damages to the jury, we are nevertheless required to conduct de novo review—sua sponte if necessary—of the "appropriateness of the size of punitive damage awards."  *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 144 (Iowa 1996).  "Awards will be tested with a view of the extent and nature of the outrageous conduct, the amount necessary for future deterrence, and *with deference to the relationship between the punitive award*

---

[29] IronPlanet's claimed "strategic decision" not to pursue what it now describes as the full extent of the damage Scheckel caused by breaching the contract does not change the speculative character of its evidence of in support of a consequential damages award in excess of the actual amount lost in the transaction.

*and plaintiff's injury, as reflected in any award for compensatory damages.*" *Ezzone v. Riccardi*, 525 N.W.2d 388, 399 (Iowa 1994) (emphasis added). In addition, we "consider all circumstances surrounding the conduct and relationship between the parties." *Id.*

In this case, the parties are commercial adversaries in a fiercely competitive industry, and aggression in competition is to be expected. Nevertheless, the jury determined Ritchie's conduct was in willful and wanton disregard for the rights of IronPlanet. It found Ritchie engaged in a persistent course of intentional conduct to destroy the contractual relationship between Scheckel and IronPlanet.

However, the district court correctly reduced the compensatory damages, and the $1.5 million punitive damage award exceeds the amount necessary to deter future improper acts by Ritchie. As such, we order remittitur. Judgment for punitive damages against Ritchie is affirmed in the amount of $900,000 if IronPlanet agrees to a remittitur of all punitive damages exceeding that amount. *See id.*; *Wilson*, 588 N.W.2d at 148. We remand to the district court for acceptance of remittitur and entry of judgment in that amount.[30]

### IX. Conclusion

The three parties raised many issues on appeal asserting legal error in the district court's rulings throughout the case. We have found no error. The district

---

[30] Our reduction is not based on Ritchie's request to reduce the punitive damages pro rata relative to the district court's reduction of compensatory damages by partial grant of JNOV, as discussed above. Ritchie's citation to authority for our ability to reduce pro rata is a case applying Missouri law. *Ogilvie v. Fotomat Corp.*, 641 F.2d 581, 587 (8th Cir. 1981). In Iowa, however, our supreme court "has expressly rejected the use of mathematical ratio in examining punitive damages." *Ryan v. Arneson*, 422 N.W.2d 491, 496 (Iowa 1988).

court properly excluded cumulative evidence. It properly exercised its discretion in declining to modify the trial transcript where it lacked a satisfactory basis upon which to determine precisely how to do so. It did not abuse its discretion in declining to submit a redundant special interrogatory to the jury, nor did it err in failing to issue additional findings of fact that would not have enabled to it properly dispose of any issues as a matter of law.

It did not err in denying several motions from Ritchie and Scheckel on a multitude of bases for judgment as a matter of law because the record reflects substantial evidence upon which a jury could reach many disparate conclusions, rendering judgment as a matter of law improper. The jury instructions, in context, give rise to no danger of prejudice and therefore cannot serve as a basis for relief. The court's partial grant of JNOV was proper.

However, the amount of punitive damages awarded was excessive, and we order remittitur to correct it. The punitive damage award is remitted to $900,000, and we remand to the district court for entry of that award. If IronPlanet rejects the remittitur, the trial court shall order a new trial. *See Wilson*, 558 N.W.2d at 148.

**AFFIRMED AS MODIFIED ON APPEAL AND REMANDED; AFFIRMED ON CROSS-APPEAL.**